59 F.3d 165
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 The AMERICAN INSURANCE COMPANY, a Nebraska Corporation,
Plaintiff-Appellee,
v.
Lawrence EGERTON, Jr., Defendant-Appellant.
 No. 94-1911.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1995.
Decided June 21, 1995.
 
 ARGUED: Robert Wier Franklin, Tuggle, Duggins & Meschan, P.A., Greensboro, North Carolina, for Appellant. J. Alexander Porter, Porter & Barrett, Atlanta, Georgia, for Appellee. ON BRIEF: Robert C. Cone, David F. Meschan, TUGGLE, Duggins & Meschan, P.A., Greensboro, North Carolina, for Appellant.
 Before MURNAGHAN and HAMILTON, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 This appeal concerns the liability of Lawrence Egerton, Jr. as an indemnitor to the American Insurance Company under a written indemnification agreement. Egerton appeals from the district court's grant of summary judgment in American's favor, challenging both the court's determination that he was liable to American and its decree of specific performance ordering him to deposit collateral with American. He also appeals the court's award of attorneys' fees. We affirm both prongs of the district court's grant of summary judgment and its award of attorneys' fees, but reduce the amount of collateral Egerton must post.
 
 
 2
 * Egerton was a founder and part owner of U-Fill'Er-Up, Inc., which sold self-service gasoline through convenience stores. He and U-Fill'Er-Up executed a general indemnity agreement, dated July 6, 1977, whereby they agreed to indemnify Fireman's Fund Insurance Company and its subsidiaries, including American, for liability incurred on motor fuel tax bonds American issued to state taxing authorities on U-Fill'Er-Up's behalf.
 
 
 3
 Between July 10, 1977, and August 9, 1991, American issued at least three such fuel tax bonds. Two of these were in favor of the Commonwealth of Virginia and one ran in favor of the State of North Carolina. The Virginia bonds provided that American would reimburse the state up to $100,000 if U-Fill'Er-Up failed to pay its motor fuel taxes and up to $20,000 if it failed to pay its special fuels supplier's taxes. The North Carolina bond initially provided for a penal amount of $20,000, but eventually was increased to $158,000, effective September 1, 1991.
 
 
 4
 On October 2, 1991, the Supreme Court of North Carolina denied U-Fill'Er-Up's petition for discretionary review[1] of a decision by the North Carolina Court of Appeals affirming the company's liability for delinquent motor fuel taxes.[2] Including interest and penalties, U-Fill'Er-Up's tax liability exceeded $859,000.
 
 
 5
 At the time, Egerton, then U-Fill'Er-Up's president, was engaged in an ongoing dispute with the company's other major stockholder, J.J. Chamberlain, Jr., concerning the management of U-Fill'Er-Up. This conflict culminated with Chamberlain calling a special meeting of the company's shareholders. Immediately prior to the meeting, scheduled for October 9, 1991, Egerton and his wife resigned as officers and directors of U-Fill'Er-Up and withdrew their personal guaranties of the company's obligations. On October 10, 1991, they notified Fireman's by facsimile letter that they wished to be relieved of continued liability for bonds previously issued or renewed by American. American responded to Egerton's letter on November 7, 1991, reminding him that, under the indemnity agreement, his liability would continue with respect to any bonds issued prior to his resignation or within thirty days thereafter.
 
 
 6
 U-Fill'Er-Up filed a Chapter 11 bankruptcy petition on November 5, 1991. The next day, Virginia made demand of $100,000 upon American under the motor fuel tax bond, based on U-Fill'Er-Up's failure to pay taxes on its gasoline sales for September 1991. On December 4, after posting reserves of $258,000 to cover its potential liabilities under the bonds, American sent Egerton a letter demanding that he advance $258,000 of security collateral to cover these reserves pursuant to paragraph 3 of the indemnity agreement.[3] American's letter specifically referenced both the North Carolina bond and the Virginia motor fuel tax bond and advised him that, if he failed to respond within five days, American's counsel would "proceed accordingly." That same day, American forwarded copies of five bonds to Egerton, including the Virginia tax bond involved in this appeal, along with a second letter stating that the copies were being sent "[p]ursuant to your recent conversation." This second letter asked Egerton to advise American if he needed "other information or documentation." Egerton did not respond to either letter.
 
 
 7
 On December 9, 1991, the Commonwealth of Virginia executed a Conditional Release and Assignment of Claim with regard to the $100,000 motor fuel tax bond. American settled this claim just days later by depositing $100,000 with the Commonwealth. Virginia subsequently made a $3,258.16 claim against the special fuels supplier's tax bond, which American paid on September 1, 1992. North Carolina has notified American of its potential claim against the $158,000 bond, but has expressed willingness to delay demand until its pending claim in U-Fill'Er-Up's bankruptcy proceedings has been settled.
 
 
 8
 American filed the action that generated this appeal in the United States District Court for the Middle District of North Carolina, alleging that Egerton owed it $110,289.54 under the indemnity agreement for payments it had made to Virginia. It also asserted that the indemnity agreement required Egerton to post collateral of $258,000. American subsequently filed a motion for summary judgment on both claims. The district court granted the motion, awarding American a judgment against Egerton in the amount of $110,289.54, plus interest, decreeing specific performance of Egerton's obligation to post $258,000 collateral with American, and awarding American attorneys' fees.
 
 
 9
 Egerton appeals the district court's grant of summary judgment and its award of attorneys' fees. We affirm the $110,289.54 judgment against Egerton, the order of specific performance, and the award of attorneys' fees. However, because the judgment for American included the amount it paid on the Virginia bonds, we reduce to $158,000 the total collateral Egerton must post with American so as to equal American's exposure under the North Carolina bond.
 
 II
 
 10
 We review a district court's grant of summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).
 
 
 11
 We are concerned here with the question of whether American complied with the indemnity agreement's express terms. If the agreement is clear and unambiguous, it should be enforced according to its terms. Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir.1983) (existence of express indemnification contract requires court to determine surety's rights in accordance with terms of that contract, rather than looking to "general 'indemnity principles' " for guidance).
 
 
 12
 Paragraph 2 of the indemnity agreement provides that
 
 
 13
 [t]he Indemnitors will indemnify the Surety against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the Surety may sustain or incur by reason of, or in consequence of the execution of such bonds ... including but not limited to, sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, expenses paid or incurred in enforcing the terms hereof, in procuring or attempting to procure release from liability, or in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid. Paragraph 19 permits any indemnitor to notify the surety of his desire to terminate the agreement, but requires "not less than thirty days written notice by registered mail" and further specifies that "any such notice of termination shall not operate to modify, bar, discharge, limit, affect or impair his liability hereunder on or by reason of any such bond executed prior to the termination of such thirty days."
 
 
 14
 In granting American's motion for summary judgment, the district court held that, as a matter of law, the indemnity agreement's express terms entitled American to the relief it requested. Although we do not agree entirely with the district court's reasoning, Egerton is obligated to indemnify American for payments it made to settle Virginia's claims against the bonds and to post collateral in the amount of American's potential liability to North Carolina.
 
 
 15
 In support of the district court's action, American contends that paragraph 8[4] clearly gave it the right to settle any claim brought under a bond it had issued and that its decision to settle Virginia's claim, if made in good faith, was binding on Egerton. Asserting that Egerton simply ignored its letter of December 4, 1991, American maintains that he waived any right to formal notice of its pending settlement of Virginia's claim. Egerton counters that the record facts do not support a finding of waiver and that the district court erroneously interpreted paragraph 10[5] of the agreement as providing for an automatic waiver. He also contends that American acted in bad faith in settling the Virginia claim. The district court concluded that Egerton's assertion that American had breached the indemnity agreement by failing to notify him of its intent to settle Virginia's claims lacked merit because "Paragraph 10 of the Agreement clearly is a waiver of notification of the execution of the bonds" and because American "did not act in bad faith in failing to notify" Egerton.
 
 
 16
 On appeal, Egerton continues to stress American's failure to notify him of its intent to settle Virginia's claims. He argues that paragraph 10 relates to notice concerning the execution of bonds, not settlement of claims. However, even if we accept Egerton's contention, we find that he effectively waived any right he may have had to be notified of American's intent to settle Virginia's claims.[6]
 
 
 17
 The Commonwealth of Virginia made its claim against the $100,000 bond by letter dated November 6, 1991. On November 7, American wrote Egerton concerning his request for release from the bond, denying the release and reminding him of his continued liability. Egerton did not reply to American's letter. On December 4, 1991, after setting aside reserves of $258,000 for the Virginia and North Carolina claims, American made a written demand on Egerton to deposit collateral in that amount, as provided for under the terms of the indemnity agreement. Its letter referenced the obligations under both the North Carolina and Virginia bonds. Egerton, a practicing attorney, had represented U-Fill'Er-Up in litigation concerning the company's liability for the delinquent North Carolina motor fuel taxes. He was deeply involved in U-Fill'Er-Up's fiscal and legal affairs both before and during the company's bankruptcy proceedings. To assert that he was not aware of Virginia's fuel tax bond claims is to test credulity. We are persuaded not only that American's December 4 letter put him on notice of his right to assert a paragraph 8 request, but also that he was or should have been aware of American's imminent liability on the bonds and the fact that it had no recourse but to settle Virginia's claims. Although the district court perhaps did not explicate the appropriate reason, we are persuaded that it correctly found Egerton had waived any notice to which he was entitled.
 
 
 18
 Egerton also contends that American acted in bad faith because it could have obtained payment of Virginia's entire claim from the bankruptcy estate's assets. This argument rests on his contention that American was entitled under Sec. 507(a)(7)[7] of the Bankruptcy Code, 11 U.S.C.A. Sec. 507(a)(7) (West 1993), to be subrogated to Virginia's priority status for the state's tax claim against U-Fill'Er-Up and that the estate had sufficient funds to pay that claim in full. In our view, American would not be subrogated to Virginia's priority status for its tax claim, so this contention likewise fails. We are persuaded that Congress did not intend that third parties be subrogated to Sec. 507(a)(7) tax claim priority status. See 3 William Miller Collier, Collier on Bankruptcy Sec. 507.07 (Lawrence P. King et al. eds., 15th ed.1988); In re Kaldis, 122 B.R. 54, 55 (Bankr.S.D. Tex.1990); Creditor's Comm. v. Massachusetts Dep't of Revenue, 105 B.R. 145, 149 (D. Mass.1989); In re Tentex Marine, Inc., 83 B.R. 530, 534 (Bankr.W.D. Tenn.1988); In re Gaumer, 83 B.R. 3, 4 (Bankr.S.D. Ohio 1988).
 
 
 19
 In addition, Egerton seems to argue that American's alacrity in paying Virginia's tax bond claim evidenced bad faith. We have held, supra, that American had the right to settle the claim in a manner of its own choosing. Furthermore, American was jointly and severally liable on the obligation[8] and its prompt payment of acknowledged liability could hardly be considered evidence of bad faith. See United States v. Manning Coal Co., 977 F.2d 117, 122 (4th Cir.1992) ("The essence of joint and several liability is that a creditor 'may sue one or more of the parties to such liability separately, or all of them together at his option.' ") (quoting Tavery v. United States, 897 F.2d 1032, 1034 (10th Cir.1990)). See also Credit Alliance Corp. v. Williams, 851 F.2d 119, 121 (4th Cir.1988) (Bankruptcy Code's automatic stay provisions do not apply to state court action brought against a surety).
 
 
 20
 In sum, Egerton, after effective notice of Virginia's claim, failed not only to deposit the requisite cash or collateral with American, but also failed to request that American litigate that claim. He clearly waived his rights under paragraph 8, and American was entitled to exercise its "exclusive right to decide and determine" Virginia's tax claim. His claim of bad faith is similarly without merit. American cannot be held culpable for its prompt payment of an acknowledged liability and for not pursuing a nonexistent subrogation claim.
 
 III
 
 21
 The district court's order of specific performance required Egerton to post $258,000 of collateral with American. Egerton challenges both the court's decision ordering specific performance and the amount of collateral it ordered him to post. We review for abuse of discretion the district court's decision to grant specific performance. Klein v. PepsiCo, Inc., 845 F.2d 76, 78 (4th Cir.1988).
 
 
 22
 Paragraph 3 of the indemnity agreement required Egerton to deposit, on demand, collateral to the extent of any reserve that American established to cover any claim or liability. American posted reserves of $258,000 to cover its potential liability to Virginia and North Carolina. It notified Egerton of this fact in its December 4, 1991, letter and, citing the agreement, demanded that he deposit collateral in that amount.
 
 
 23
 However, the $258,000 total reflects American's liability on the Virginia bond, as well as its potential liability on the North Carolina bond. The district court's judgment required Egerton to reimburse American for payments it made pursuant to the Virginia bonds. The specific performance, therefore, should have been limited to $158,000--American's potential liability under the North Carolina bond.
 
 IV
 
 24
 Finally, we find no merit in Egerton's contention that the district court erred in allowing American to recover attorneys' fees. Egerton asserts that paragraph 2 of the indemnity agreement only entitles American to recover "expenses" it incurred in attempting to enforce, through litigation, its rights against him. His interpretation of that provision, however, disregards the context in which the phrase "expenses paid or incurred in enforcing the terms hereof" appears--in a list of enumerated items preceded by the qualification, "including but not limited to." We do not find that this non-exhaustive list negates paragraph 2's initial language providing that "[t]he Indemnitors will indemnify the Surety against any and all liability, loss, costs, damages, fees of attorneys and other expenses" it might suffer as a consequence of executing the bonds.
 
 
 25
 The district court's grant of summary judgment and its award of attorneys' fees are, therefore, affirmed but modified to require that Egerton post security to cover American's $158,000 exposure under the North Carolina bond.
 
 AFFIRMED AS MODIFIED
 
 
 [1]
 Secretary of Revenue v. U-Fill'Er-Up, Inc., 409 S.E.2d 597 (N.C.1991)
 
 
 [2]
 North Carolina's Secretary of Revenue had questioned the propriety of certain tax credits U-Fill'Er-Up took from 1985 through 1987. After unsuccessfully challenging the assessments for the unpaid taxes at an administrative hearing and before a state trial court, U-Fill'Er-Up appealed to the North Carolina Court of Appeals and eventually to the state supreme court
 
 
 [3]
 Paragraph 3, in pertinent part, provides that
 [i]f the Surety shall set up a reserve to cover any liability, claim asserted, suit or judgment under any such bond, the indemnitors will, immediately upon demand and whether or not the Surety shall have made any payment therefor, deposit with the Surety a sum of money equal to such reserve and any increase thereof as collateral security on such bond....
 
 
 [4]
 Paragraph 8 of the indemnity agreement provides that:
 The Surety shall have the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against the Surety or the Indemnitors or any one of them on any such bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision thereon, if made in good faith shall be final and binding upon the Indemnitors, unless the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys fees, including those of the Surety. An itemized statement of payments made by the Surety for any of the purposes specified herein, sworn to by an officer of the Surety, or the voucher or vouchers for such payments, shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety for such payments, with interest.
 
 
 [5]
 Paragraph 10 provides for the indemnitors' waiver of "notice of the execution of any such bonds or of any act, fact or information coming to the notice or knowledge of the Surety concerning or affecting its rights or liabilities under any such bond or rights or liabilities of the Indemnitors hereunder, notice of all such being hereby expressly waived."
 
 
 [6]
 Two other provisions of the indemnity agreement tend to negate Egerton's contention that American acted in bad faith by settling Virginia's claims without notifying him of its intent to do so. According to paragraph 9, Egerton, as indemnitor, "authorize[d] the Surety in its sole discretion ... to take such steps as the Surety may deem necessary or proper to obtain release from liability from any such bond." Paragraph 17 of the indemnity agreement states that
 [t]he Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety or its designee as their Attorney in Fact with the right, but not the obligation, to exercise all of the rights of Indemnitors assigned, transferred and set over to the Surety in this Agreement.... The Indemnitors hereby ratify and affirm all acts and actions taken and done by the Surety or its designee as such Attorney in Fact.
 
 
 [7]
 Congress recently inserted a new priority item into section 507(a). As a result, the subsection allowing priority status for governmental units' unsecured tax claims has once again been renumbered. It now appears at 11 U.S.C.A. Sec. 507(a)(8) (West Supp.1995). In this opinion, however, we refer to it by its previous designation, Sec. 507(a)(7)
 
 
 [8]
 The district court held that "American was not obligated to 'wait and see' the results of the bankruptcy proceedings before making or processing claims" because the indemnity agreement's second introductory paragraph "states that the liability of American and Egerton is joint and several." The Virginia bonds contained language binding American and U-Fill'Er-Up "jointly and severally" to pay the amount of each bond, but Egerton correctly points out that the indemnity agreement lacks similar language. As the cases we cite indicate, however, this is of no consequence because Egerton and American were jointly and severally liable under principles of general law