**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: WALTER NIEVES,

*Debtor.*

BRIAN A. GOLDMAN,

*Plaintiff-Appellee,*

v.

CAPITAL CITY MORTGAGE
CORPORATION,

*Defendant-Appellant.*

No. 08-2160

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:07-cv-02971-CCB; 03-08292-DK; 03-64849-DK)

Argued: January 27, 2010

Decided: June 10, 2011

Before MICHAEL,[1] MOTZ, and GREGORY,
Circuit Judges.

Affirmed by published per curiam opinion.

[1]Judge Michael heard oral argument in this case but passed away before the decision was filed. The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

**COUNSEL**

**ARGUED:** Patricia A. Borenstein, MILES & STOCK-BRIDGE, PC, Baltimore, Maryland, for Appellant. Evan M. Goldman, GOLDMAN & GOLDMAN, PA, Baltimore, Maryland, for Appellee. **ON BRIEF:** Richard L. Costella, MILES & STOCKBRIDGE, PC, Baltimore, Maryland, for Appellant.

---

**OPINION**

PER CURIAM:

Brian A. Goldman, trustee for the Chapter 7 bankruptcy estate of Walter Nieves (Debtor), brought suit against various defendants to avoid a series of transfers of an 11.8 acre parcel of real property in Maryland (the Property) originally owned by the Debtor. By consent orders, the Trustee accomplished avoidance of the Property's initial and second transfers. Trial proceeded against the third transferee, Capital City Mortgage Corporation (CCM). The bankruptcy court entered judgment in favor of the trustee and avoided the transfer, finding that CCM did not show it was "a transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). CCM appealed to the district court, which affirmed. CCM appeals once more. We affirm.

I.

A.

According to its President, Alan Nash, CCM lends money to "people or institutions that have difficulty getting credit elsewhere." J.A. 258. Its website advertises that CCM "does not rely on credit scoring and has generous debt to income ratios." J.A. 257. The website also explains to potential cus-

tomers that CCM can lend money "[e]ven if you or a client have an existing bankruptcy." J.A. 257.

On April 8, 2003, Michael Nastasi went to CCM's office and filled out a credit application for 1st Financial Mortgage Services, LLC ("1st Financial"). J.A. 223, 226-27, 229. In applying for a loan for 1st Financial, Nastasi dealt directly with CCM's President, Alan Nash. J.A. 222-23. Nash met with Nastasi for less than an hour. J.A. 256.

Nastasi told Nash that he was the sole member and resident agent of 1st Financial. J.A. 336. However, Nastasi never provided Nash with 1st Financial's articles of organization or operating agreement. *Id.* CCM never attempted to verify that Nastasi owned 1st Financial or that Nastasi was authorized to take out loans for the company. This failure occurred despite the fact that Nastasi, according to Nash, was "confused about the name of his LLC because I think in some documents he listed F-I-R-S-T and some of them he listed it 1-S-T." J.A. 321.

In the credit application he filled out for 1st Financial, Nastasi provided only the addresses for 1st Financial and Nastasi, the tax ID number for 1st Financial, and the address of the Property, which was apparently represented as the only property owned by 1st Financial. J.A. 227. The application contained no financial information for 1st Financial. J.A. 228. CCM never obtained any financial information for 1st Financial despite Nash's statement at trial that CCM is "always concerned with the creditworthiness of our borrowers." J.A. 226, 263.

CCM never viewed 1st Financial's deed for the Property listed in the credit application. J.A. 229. Nastasi provided Nash with only a legal description of the Property and a year-old appraisal valuing the property at $265,000. J.A. 225, 229, 260. The copy of the appraisal noted that it was performed before 1st Financial took title to the Property. J.A. 260.

Nevertheless, CCM decided to make a one year, non-recourse loan to 1st Financial for $155,000, at a rate of 19.75% with two points. J.A. 233-34. The loan was secured by the Property. CCM's only recourse against 1st Financial in the event of default, therefore, was to foreclose on the Property. The bankruptcy court found that CCM "may have anticipated, and even hoped for a payment default." J.A. 379. In fact, 1st Financial never made a payment on the loan, causing the accrual of large penalties and a default interest rate of 24%. J.A. 234-35, 237. Total payoff for the loan as of November 1, 2006 was $326,512.73. J.A. 338.

Prior to settling the loan on May 29, 2003, CCM obtained a title insurance commitment from Paramount Title & Escrow, LLC (Paramount). Paramount obtained, per CCM's instructions, a certificate of good standing for 1st Financial issued by the Maryland State Department of Assessments and Taxation (SDAT). J.A. 332.

The title commitment from Paramount insured title for $170,000. J.A. 229. It identified 1st Financial and CCM as parties to the deed of trust, listed the Property description, and committed to insure fee simple title. J.A. 374. It did not indicate that any records search was undertaken by Paramount, nor did it provide the results of any such search. *Id.* The bankruptcy court found no evidence that CCM requested any title or record search. *Id.* It did not perform one itself.

The title commitment was issued on April 24, 2003 at eight a.m. J.A. 230. 1st Financial did not record its deed to the Property until later that same day. J.A. 30, 260. Therefore, Paramount insured title before it could confirm that 1st Financial actually owned the Property. All of the foregoing facts led the bankruptcy court to find that "little, or no effective records search was undertaken." J.A. 374.

The certificate of good standing was obtained on April 30, 2003. J.A. 326. Nash could not recall whether he inspected

the good standing certificate prior to closing the loan on May 29, 2003. J.A. 334. The trustee's expert on real estate transfers and closings testified that a month-old certificate of good standing is not satisfactory and would require updating "within a week of closing." J.A. 277, 280. Indeed, CCM conceded at the hearing before the district court that it "had at least been aware before closing on the Property that 1st Financial's legal status was uncertain, but had nonetheless relied on the April 30 certificate of good standing." J.A. 415.

The loan closed on May 29, 2003. The deed of trust states that the grantor is "First Financial Mortgage Services, LLC." J.A. 166. The signature page, however, contains an illegible signature from a "Manager" for "1st Financial Mtg Svce, LLC." J.A. 172. The trustee's expert testified that a manager may not sign on behalf of an LLC unless authorized by the operating agreement. J.A. 278. The trustee also testified that "critical parts of the notary [were] left out" because it failed to identify the individual who appeared and signed the deed on behalf of 1st Financial, rendering the deed invalid. J.A. 279, 300. Similarly, the deed of trust note states that the maker is "First Financial Mortgage Services, LLC." J.A. 178. The signature page contains an illegible signature for the maker and gives no indication as to who signed it or with what authority. J.A. 188. CCM recorded the deed of trust on June 30, 2003. J.A. 373. The expert also testified that in his "customary approach," he would not have accepted the deed that 1st Financial took on the property because the deed was not notarized, was not acknowledged, and did not comport with the loan documents. JA 287-91. These deficiencies impair the ability of the person on the deed to borrow money on the property. JA 287-89.

B.

Two years before the CCM loan closed, the Debtor's assets were frozen as a result of a Department of Labor investigation into the Debtor's company. J.A. 407. Prior to August 8, 2002,

the Debtor had owned the Property with his son, Michael Nieves. J.A. 371. On August 8, 2002, the Debtor and his son transferred the Property to Edgardo Nieves (Edgardo), the Debtor's brother, for zero consideration (the initial transfer). J.A. 25, 371. The deed identifies the initial transferee as "Edgardo Nieves, his brother" and states "NO CONSIDERATION TAX," and "NO TITLE EXAMINATION." J.A. 25. Two months later, on October 21, 2002, the Debtor and his son entered into a consent judgment with the Secretary of Labor in the amount of $2,800,000. J.A. 121-40.

On March 19, 2003, two months before the CCM loan closed, the Debtor filed for bankruptcy under Chapter 13. While the Debtor's Chapter 13 petition was pending, Edgardo transferred the Property to 1st Financial on April 24, 2003, by deed dated April 10, 2003 (the second transfer). J.A. 371. 1st Financial was owned by Nastasi, a friend of the Debtor and Edgardo. J.A. 372. This deed was recorded on April 24, 2003 at 2:05 p.m. J.A. 371-72. The deed recited an alleged consideration of $18,000. J.A. 372. It was not notarized. J.A. 372.

At the time of the second transfer, 1st Financial was not a valid entity; its charter had been forfeited on October 5, 2001. *Id.* Articles of Reinstatement for 1st Financial were filed with SDAT on April 30, 2003, causing it to regain temporarily good standing. *Id.* However, the Articles of Reinstatement were voided by SDAT on May 7, 2003, retroactive to April 30, 2003, because the proper fees were not paid by 1st Financial. *Id.* The check 1st Financial submitted with its Articles of Reinstatement had bounced. JA 160. The bankruptcy court found "that at all times relevant to the matter before the court, 1st Financial was not a legal entity." J.A. 372.

As explained above, 1st Financial later received $155,000 from CCM, secured with a deed of trust to the Property, on May 29, 2003. CCM recorded the deed of trust on June 30, 2003. J.A. 373.

The Debtor's Chapter 13 petition was dismissed on August 8, 2003 and the Debtor filed the instant Chapter 7 petition on October 14, 2003. J.A. 371. On December 17, 2003, the Debtor's bankruptcy trustee commenced adversary proceedings against Edgardo and 1st Financial in the United States Bankruptcy Court for the District of Maryland to avoid the fraudulent transfers and recover the Property, pursuant to 11 U.S.C. §§ 544 and 550. J.A. 20. On April 2, 2004, the trustee filed an amended complaint adding CCM as a defendant. J.A. 35-36. It is undisputed that both the initial transfer and the second transfer were avoidable as fraudulent transfers pursuant to 11 U.S.C. § 544. By consent orders, the initial transfer and the second transfer were avoided on August 23, 2004, and August 26, 2004, respectively. J.A. 370-71.

On August 19, 2004, CCM consented to the sale of the Property by the trustee and to escrow $300,000 pending the result of the adversary proceeding. J.A. 55-57. The Property was sold by the trustee for $475,000 on June 24, 2005. J.A. 144-45, 156.

The trustee's action proceeded to trial against CCM on November 7, 2006. The bankruptcy court issued its decision in favor of the trustee on October 3, 2007, J.A. 370, and avoided the third transfer to CCM, J.A. 385. The bankruptcy court further ordered that the trustee may recover for the benefit of the estate the proceeds from the sale of the Property. J.A. 386.

CCM appealed the bankruptcy court's order to the District Court of Maryland on October 12, 2007. J.A. 387. The district court affirmed on August 20, 2008. J.A. 420. CCM filed a timely notice of appeal to this court on September 22, 2008. J.A. 421-20.

## II.

In an appeal from a bankruptcy proceeding, we apply the same standard of review that the district court applied when

it reviewed the bankruptcy court's decision. *Bowers v. Atlanta Motor Speedway, Inc. (In re Se. Hotel Props., Ltd. P'ship)*, 99 F.3d 151, 154 (4th Cir. 1996). The legal conclusions of both the district court and the bankruptcy court are reviewed de novo and the factual findings of the bankruptcy court are reviewed for clear error. *Chmil v. Rulisa Operating Co. (In re Tudor Assocs., Ltd., II)*, 20 F.3d 115, 119 (4th Cir. 1994).

## III.

Section 544 of the Bankruptcy Code allows the bankruptcy trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b). This section is commonly used to avoid, under state law, fraudulent transfers from the Debtor's estate.

In addition to avoiding transfers, the bankruptcy trustee is allowed to recover the avoidable property, or the value of such avoidable property, from "the initial transferee" or "any immediate or mediate [*i.e.*, subsequent] transferee of [an] initial transferee." 11 U.S.C. § 550(a). A trustee has an absolute right to recover from the initial transferee. § 550(a)(1). Any immediate or mediate transferee of the initial transferee, however, has an affirmative defense to recovery if such transferee "takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided." § 550(b)(1). "[O]nce the plaintiff has established that a party is an immediate or mediate transferee of the initial transferee, a defendant claiming a defense to liability under § 550(b) bears the burden of proof." *Tavenner v. Smoot (In re Smoot)*, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999).[2]

---

[2]In *In re Bressman*, the Third Circuit declined to definitively address the allocation of the burden of proof, finding the "burden of persuasion issue . . . to be a difficult one." 327 F.3d 229, 236 n.2 (3d Cir. 2003). Nevertheless, we agree with the weight of authority holding that § 550(b) constitutes a defense to an avoidance action which defendant bears the burden to prove. *See In re Smoot*, 265 B.R. at 140 (collecting cases holding that burden of proof for § 550(b) defense rests on transferee).

The Bankruptcy Code does not define what it means to take "in good faith" or "without knowledge of the voidability of the transfer avoided." CCM asserts that the bankruptcy and district courts erred in their interpretations of both legal standards in this case. We address the knowledge prong of § 550 before the good faith prong because it is the only one this court has ever commented on.

This court has only once before interpreted the knowledge prong in § 550(b)(1). In *Smith v. Mixon*, we ruled that knowledge, for purposes of § 550(b)(1), "does not mean 'constructive notice.'" 788 F.2d 229, 232 (4th Cir. 1986). Rather, "the term 'knowledge' includes only actual notice." *Id.*

CCM argues that the bankruptcy court erred in deciding that *Mixon* did not "categorically limit 'knowledge' to facts of which a defendant was completely cognitive." J.A. 383. To the extent the bankruptcy court held CCM to a constructive or inquiry notice standard to determine CCM's knowledge, regardless of what it actually knew, we agree. *Mixon* confirms that § 550 does not impose a requirement of due diligence on every transaction.

However, the *Mixon* opinion is not limited to its statement that "knowledge" means only "actual notice." 788 F.2d at 232. *Mixon* goes on to explain the meaning of "knowledge" by quoting from *Collier on Bankruptcy*:

> The Commission [on the Bankruptcy Laws of the United States][3] intended the standard to mean 'if the transferee knew facts that would lead a reasonable

---

[3]"The Commission on the Bankruptcy Laws of the United States filed a draft statute with Congress in 1973. H. Doc. No. 93-137, 93d Cong., 1st Sess., pt. II (1973) . . . . The Commission's bill contained detailed notes interpreting the proposed statute. The proposed statute was introduced in the 93rd Congress without notes as H.R. 10792 and S. 2565." 5 Collier on Bankruptcy ¶ 550.03[3] n.16 (2009).

> person to believe that the property [transferred] was recoverable.' . . . [T]he transferee should be held to have knowledge of the voidability of the transfer if, *inter alia*, he has reasonable cause to believe that a petition may be filed.

788 F.2d at 232 n.2 (quoting 4 L. King, Collier on Bankruptcy ¶ 550.03 at 550-10 (15th ed. 1985)).

*Mixon*'s actual notice standard means that there is no "duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain." *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (citing *Mixon*, 788 F.2d at 232). However, *Mixon* also makes clear that "'knowledge' is satisfied if the transferee 'knew facts that would lead a reasonable person to believe that the property transferred was recoverable.'" *In re Nordic Village, Inc.*, 915 F.2d 1049, 1055 (6th Cir. 1990) (quoting *Mixon*, 788 F.2d at 232 n.2), *rev'd on other grounds sub nom*, *United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992). *Mixon*'s actual notice standard, therefore, does not require actual knowledge of the transfer's voidability. Instead, actual knowledge of facts that would lead a reasonable person to believe that the transferred property was voidable is all that is required to show knowledge.

As for the good faith prong, the bankruptcy court and the district court applied an objective standard to determine if CCM took the Property in good faith, and CCM challenges this reading of the statute. The Bankruptcy Code does not provide a definition for good faith and this court has never defined good faith as it pertains to § 550(b)(1). We now hold that good faith, as used in § 550(b)(1), should be determined under an objective standard.

In determining good faith for the purposes of a § 550(b)(1) defense, courts should analyze what the transferee "knew or should have known instead of examining the transferee's

actual knowledge from a subjective standpoint." *Gold v. Laines (In re Laines)*, 352 B.R. 397, 406 (Bankr. E.D. Va. 2005) (quoting *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995)) (internal quotations and citations omitted); *see also*, 5 Collier on Bankruptcy ¶ 550.03[2] (2009) (endorsing an objective good faith test). However, like *Mixon*, what the transferee should have known depends on what it actually knew, and not what it was charged with knowing on a theory of constructive notice. "In other words, a transferee does not act in good faith when he has sufficient [actual] knowledge to place him on inquiry notice of the debtor's possible insolvency." *Gold*, 352 B.R. at 406 (quotations and citations omitted). In so holding, we arrive at the same conclusion as the three other circuit courts that have addressed the issue. *See Brown*, 67 F.3d at 1355; *Hayes v. Palm Seedling Partners (In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 535-36 (9th Cir. 1990); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 897-98 (7th Cir. 1988).

An objective good faith analysis is counseled by this court's opinion in *Huffman v. Commerce Sec. Corp. (In re Harbour)*, 845 F.2d 1254 (4th Cir. 1988). *Huffman* addressed whether an initial transferee of avoided property could be considered a "mere conduit" outside the scope of § 550 altogether. *Id.* at 1256-57. *Huffman* endorsed the idea that § 550 might not apply on equitable grounds to such an initial transferee when the transferee took in good faith. *Id.* at 1258. The initial transferee in *Huffman*, however, could not make out a showing of good faith because of her "wil[l]ful ignorance in the face of facts which cried out for investigation." *Id.*

The good faith standard applicable to immediate and mediate transferees should be the same as the good faith standard for initial transferees. Consistent with *Huffman*, we apply an objective good faith standard for the defense available to immediate and mediate transferees in § 550(b)(1). Immediate and mediate transferees do not take in good faith if they

remain "wil[l]ful[ly] ignoran[t] in the face of facts which cr[y] out for investigation." 845 F.2d at 1258.

Moreover, our analysis comports with the development of the good faith standard in other areas of commercial law. The Uniform Commercial Code, for instance, uses a similar good faith standard in two commercial settings: determining holders in due course, *see* U.C.C. § 3-302 (2002), and the implied duty of good faith in contracts, *see* U.C.C. § 1-304 (2001). Where it applies, "good faith" generally means "honesty in fact and observance of reasonable commercial standards of fair dealing *in the trade*." See U.C.C. § 1-201(b)(20) (emphasis added); *see also* Black's Law Dictionary (9th ed. 2009) (defining "good faith" as "honesty in belief," "faithfulness to one's duty or obligation," and "observance of reasonable commercial standards of fair dealing in a given trade or business").

"Good faith" thus contains both subjective ("honesty in fact") and objective ("observance of reasonable commercial standards") components. Under the subjective prong, a court looks to "the honesty" and "state of mind" of the party acquiring the property. *See, e.g. Triffin v. Pomerantz Staffing Servs., LLC*, 851 A.2d 100, 104 (N.J. Super. Ct. App. Div.). Under the objective prong, a party acts without good faith by failing to abide by routine business practices. *See Rudiger Charolais Ranches v. Van de Graaf Ranches*, 994 F.2d 670, 672-73 (9th Cir. 1993) (reasonable commercial practice includes a "custom or practice" unless in conflict with a statute); *see also* Grant Gilmore, *The Commercial Doctrine of Good Faith Purchase*, 63 Yale L.J. 1057, 1122 n.22 (1954)(good faith standard captures routine business practices of industry).[4] We

---

[4]A rule that looks to routine business practices to set the objective good-faith standard makes good sense in the industry at issue here. Capital City belongs to an industry that thrives on bad-credit borrowers who go to Capital City because they have nowhere else to go. In exchange for a limited credit check, Capital City charges an exorbitant interest rate. If objective

therefore arrive at the conclusion that the objective good-faith standard probes what the transferee knew or should have known, *see Laines*, 352 B.R. at 406, taking into consideration the customary practices of the industry in which the transferee operates.[5]

CCM argues that our holding in *Mixon* requires us to find that the absence of actual knowledge of the voidability of the transfer is all that is needed to find good faith under § 550(b)(1). It also asserts that to rule otherwise "eviscerates the *Mixon* holding" and impermissibly renders the knowledge prong as mere surplusage. Br. of Appellant at 19. We do not agree.

First, *Mixon* discusses only the knowledge prong of § 550(b)(1), not good faith. This court has never interpreted the good faith prong of § 550(b)(1) and *Mixon* does not control its interpretation. Moreover, an objective good faith analysis is entirely consistent with *Mixon*. *Mixon* asks if the transferee possesses actual knowledge of facts that would lead a reasonable person to believe that the transferred property

---

"good faith" required too much diligence by the lender or forecloses lending to a high-risk borrower, it could potentially dry up the subprime credit market. Thus, resorting to routine business practices to fashion a definition of good faith gives an industry wide latitude in which to operate, so long as it follows the very customs the industry itself has created. *See* Gilmore, *The Commercial Doctrine of Good Faith Purchase*, 63 Yale L.J. at 1122 n.22 (opining how "reasonable commercial standards" as proxy for good-faith duty could "paradoxically" lower the standard of care if "evidence of business practice" so establishes).

[5]Our opinion in *Huffman* fully comports with the notion that a court looks to customary practices of an industry to assess the good-faith standard. There, we stressed that the "likelihood of bad faith on the defendant's part is lessened where the defendant is a *commercial* enterprise handling transactions in a *routine* fashion." 845 F.2d at 1257 (emphasis added). We went on to conclude that the debtor or bad faith transferee had no "valid business reason" to structure the transaction in such a suspicious fashion. *Id.* at 1258.

was voidable. An objective good faith analysis asks if the transferee possesses actual knowledge that would lead a reasonable person to inquire into the public record to see if the transferred property is voidable.

Regardless of whether CCM is correct in its argument that the knowledge prong is rendered superfluous by an objective good faith standard, we would not be convinced by this argument. To support its interpretation of the knowledge prong, *Mixon* quotes with approval from *Collier on Bankruptcy*, explaining that the knowledge prong "was included as surplusage to illustrate a transferee that could not be in good faith." *Mixon*, 788 F.2d at 232 n.2 (quoting 4 L. King, Collier on Bankruptcy ¶ 550.03 at 550-10 (15th ed. 1985)). As explained by the district court, "a transferee with actual knowledge of voidability is merely a subset of those unable to demonstrate good faith." J.A. 418. While courts normally ought to read statutes as to avoid surplusage, *see TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001), it is impossible not to do so in this case. CCM's reading of the statute would render the good faith prong equally redundant because every transferee with actual knowledge of a voidable transfer would be unable to take in good faith.

## IV.

Both sides agree that CCM was a mediate transferee of an avoided transfer, such that the trustee may recover the Property, or the value of the Property, from CCM absent the defense provided in § 550(b)(1). The parties also agree that CCM took the Property for value, thereby satisfying the first requirement of §550(b)(1). Therefore, the sole issue on appeal is whether CCM took in good faith and without knowledge of the voidability of the transfer, thereby satisfying the § 550(b)(1) defense.

We disagree with the bankruptcy court that CCM took with knowledge of the voidability of the transfer. We agree with

both the district court and the bankruptcy court that CCM did not prove that it took the Property in good faith. We address each finding in turn.

CCM did not possess the requisite knowledge under § 550(b)(1) because it did not have actual knowledge of facts that would lead a reasonable person to believe that the transfer was voidable. *Mixon*, 788 F.2d at 232 & n.2. CCM had no actual knowledge of any of the previous transfers. CCM never viewed 1st Financial's deed and did not perform a record search. J.A. 229, 374. CCM also never knew that 1st Financial was not a valid legal entity. J.A. 326-27, 334.

The district court erred insofar as it found that CCM "must be charged with [knowledge of] what a prudent and reasonable inquiry would have revealed." J.A. 384. As we explained above, the knowledge prong does not automatically put every transferee on constructive or inquiry notice. Instead, actual knowledge of facts that would lead a reasonable person to believe that the transfer was voidable is required. We find no such facts on this record.

As for the good faith prong, we hold that the bankruptcy court applied the correct legal standard of objective good faith and we affirm as not clearly erroneous its factual finding that *facts known* to CCM would have lead "a lender under the circumstances of this case [to] inquire as to the public record." J.A. 380. Indeed, CCM did not have knowledge of the voidability of the transfer because it was "wil[l]ful[ly] ignoran[t] in the face of facts which cried out for investigation." *Huffman*, 845 F.2d at 1258. Such a transferee cannot have taken in good faith.

Numerous facts known to CCM would have led a reasonable person to inquire further as to the voidability of the transfer. First are the facts dealing with Nastasi's knowledge of his own company. Nash admitted that Nastasi was "confused about the name of his LLC." J.A. 321. Nastasi's confusion

continued through the closing of the loan, as both the deed of trust and the deed of trust note named the grantor and maker, respectively, as "First Financial Mortgage Services, LLC" and not the entity's real name, "1st Financial Mortgage Services, LLC." This was not a mere technicality in the deed. According to SDAT records admitted by the trustee at trial, "First Financial Mortgage Services, LLC" is a different legal entity registered in the State of Maryland. J.A. 196. Moreover, confusion over the company name by the person purporting to be its agent indicates that the transfer might be fraudulent. Despite this, CCM never asked to view 1st Financial's articles of organization or operating agreement.

Second are the facts regarding 1st Financial's legal status. As a matter of course, the trustee's expert testified that a certificate of good standing should be obtained within a week of closing. Especially given Nastasi's confusion over the name of his company and the lack of information he provided to CCM, CCM should have obtained a certificate of good standing closer to closing the loan. A real estate expert testified that Capital City failed to follow the routine business practice of updating a month-old certificate of good standing within a week before closing the loan. CCM even conceded at the hearing before the district court that it "had at least been aware before closing on the Property that 1st Financial's legal status was uncertain." J.A. 415. This knowledge placed CCM on inquiry notice, and had it inquired into 1st Financial's standing within three weeks of closing it would have discovered that 1st Financial was not a valid entity. By failing to follow this routine business practice, Capital City did not "take" the Property "in good faith" from 1st Financial.

Finally, there are the facts relating to the chain of title to the Property of which CCM remained willfully ignorant. Despite Nastasi's confusion over the name of his company and CCM's concern regarding 1st Financial's legal status, CCM never confirmed that 1st Financial owned the Property. It never viewed the deed. As found by the bankruptcy court,

"little, or no effective records search was undertaken[,] [n]or is there any evidence that [CCM] required any search of records." J.A. 374. Such "wil[l]ful ignorance in the face of facts which cr[y] out for investigation may not support a finding of good faith." *Huffman*, 845 F.2d at 1258.

Had CCM conducted a reasonable search it would have discovered a number of facts pointing toward the voidability of the transfers. It would have discovered that the initial transfer from the Debtor and his son to Edgardo, the Debtor's brother, was made for zero consideration shortly before the Debtor filed for bankruptcy. These facts are evident on the face of the deed. The deed states that the transferee was the Debtor's brother, that no consideration was given, and that no title search was done. J.A. 25.

Moving up the chain of title, CCM would have seen that the second transfer from Edgardo to 1st Financial took place shortly after the initial transfer. The deed for the second transfer indicated a purported consideration of $18,000, well below market value. The deed was not notarized. CCM also would have realized that Nastasi filled out the credit application for 1st Financial, where he indicated that 1st Financial owned the Property, two days before 1st Financial actually received title to the Property from Edgardo. Finally, a proper SDAT request would have shown that 1st Financial's charter was forfeited at the time it received the Property.

In short, we agree with the district court that "the bankruptcy court found that [CCM] could not satisfy its burden [as to the good faith prong] when it had willfully turned a blind eye to a suspicious transaction. No clear error of fact or incorrect application of law [as to the good faith prong] has been shown." J.A. 419.

## V.

While we agree that CCM did not have knowledge of the voidability of the transfer we affirm the bankruptcy court's

finding that CCM did not take in good faith. Since a § 550(b)(1) defense requires proving all three elements, and CCM has not shown that it took in good faith, the district court's affirmance of the bankruptcy court's order in favor of the trustee is

*AFFIRMED*.