WYNN, Circuit Judge,
dissenting:
Bankruptcy Code Section 548(c) provides an affirmative defense to transferees who take in good faith. Importantly, good faith has not just a subjective, but also an objective “observance of reasonable commercial standards” component. To succeed with its good faith defense, First Tennessee Bank had to prove both aspects of good faith. But here, it failed to proffer any evidence to support a finding that it received transfers from FMI with objective good faith in the face of several alleged red flags. Because it was clear error for the district court to make the unsupported finding that First Tennessee Bank received transfers from FMI with objective good faith, I must respectively dissent from the contrary view of my colleagues in the majority.
*435 I.
We review a district court finding of good faith for clear error. “A finding is clearly erroneous if no evidence in the record supports it...Consol. Coal Co. v. Local 1643, United Mine Workers of Am., 48 F.3d 125, 128 (4th Cir.1995). Thus, we reverse findings of fact that lack evidentia-ry support — and that is, in my view, what must be done here.
II.
Under Bankruptcy Code Section 548(a), a bankruptcy trustee can avoid fraudulent transfers occurring within the two years prior to a bankruptcy petition’s filing if those transfers were made with intent to defraud or for less than reasonable consideration. 11 U.S.C. § 548(a). Nevertheless, a recipient of transferred property can keep the property if it is able to establish the elements of the good faith defense embodied in Section 548(c). 11 U.S.C. § 548(c).
In In re Nieves, this Circuit put contours on the good faith defense. 648 F.3d 232 (4th Cir.2011). As the majority notes, we held that to establish the good faith defense, a transferee needs to show both subjective and objective good faith:
“Good faith” thus contains both subjective (“honesty in fact”) and objective (“observance of reasonable commercial standards”) components. Under the subjective prong, a court looks to “the honesty” and “state of mind” of the party acquiring the property. Under the objective prong, a party acts without good faith by failing to abide by routine business practices. We therefore arrive at the conclusion that the objective good-faith standard probes what the transferee knew or should have known, taking into consideration the customary practices of the industry in which the transferee operates.
Id. at 239-40 (citations and footnotes omitted). In essence, transferees may not bury their heads in the sand, “willfully turn[ ] a blind eye to a suspicious transaction[,]” and then expect to reap the benefits of the good faith defense. Id. at 242 (quotation marks omitted). A transferee “wil[l]ful[ly] ignoran[t] in the face of facts which cried out for investigation ... cannot have taken in good faith.” Id. at 241.
Importantly, it is the transferee who bears the burden of proof on the good faith defense. As this Court has stated, “we agree with the weight of authority holding that [the good faith defense is] a defense to an avoidance action which defendant bears the burden to prove.” Id. at 237 n. 2 (citing In re Smoot, 265 B.R. 128, 140 (Bankr.E.D.Va.1999) (collecting cases holding that the burden of proof rests on the transferee)).
In sum, to establish the good faith defense, First Tennessee Bank needed to show not only subjective good faith but also objective good faith. Thus, First Tennessee Bank bore the burden of showing that its conduct comported with routine practices in its industry and that its response to potential “red flags” about FMI’s fraud comported with that of an objectively reasonable warehouse lender. The record before us shows that First Tennessee Bank failed to carry its burden.
III.
Preliminarily, I must address several general points that the majority makes, and with which I take issue, regarding the nature of the evidence required in cases such as this one and the nature of the evidence actually proffered here.
First, I agree with the majority that First Tennessee Bank could meet its burden as to the objective component of its good faith defense without presenting ex *436 pert testimony on prevailing industry standards. To be sure, such objective, third-party evidence would almost certainly be helpful in establishing industry standards. And one cannot help but wonder why it was not proffered here.
Regardless, fact witness testimony could suffice. For example, a fact witness could testify that he attended industry conferences and drafted the pertinent bank’s policies based on, and in accordance with, best practice materials received at those conferences.[8]
The problem here is that First Tennessee Bank, which bore the burden of proving its good faith defense, failed to elicit such testimony from its fact witnesses. Instead, it relied on generalities from those witnesses such as having read the Wall Street Journal and having worked in the industry for many years.
Further, an executive’s extensive knowledge of an industry does not necessarily mean that his business comports with industry standards. Indeed, that very knowledge might be used effectively for ill, enabling the executive to conceive of and perpetuate a scheme that turns industry standards on their heads. Industry knowledge and experience thus shed little light on whether an executive or his business acted with objective good faith.
Moreover, it is common knowledge that the economy, including the mortgage-backed securities industry — was in turmoil in 2007 and 2008. But that fact does not illuminate, for example, whether First Tennessee Bank’s attributing FMI’s problematic conduct to the slowdown was reasonable in light of industry standards. For it is also common knowledge that frauds such as Ponzi schemes are particularly vulnerable to implosion during economic downturns. That FMI’s troubles coincided with an economic downturn thus does not resolve objective good faith questions. Objective good faith cannot simply be assumed in tough times; it remains an affirmative defense that must always be proven.
Here, Garrett and Daugherty may have explained “their reasons” why FMI’s conduct did not suggest fraud. Ante at 431-32. But “their” reasons are evidence of “their” subjective good faith — not of objective good faith, taking into consideration industry standards.
Finally, I agree with the majority opinion that Garrett’s and Daugherty’s employment with First Tennessee Bank did not affect the admissibility of their testimony or render it incompetent. But the record is irreconcilable with the majority opinion’s assertion that the Trustee failed to object to Garrett’s and Daugherty’s “general testimony” regarding the industry or economic conditions in 2007 and 2008. Ante at 431-32. On the contrary, the Trustee repeatedly objected to Garrett’s and Daugherty’s attempts at “general testimony,” on the bases that the testimony was over-broad, that neither witness was tendered as an expert, and that the testimony should be tethered specifically to First Tennessee Bank, for which both men were testifying strictly as fact witnesses. See, e.g., J.A. 1376, 1379, 1383, 1512, 1517. In *437 response to these objections, First Tennessee Bank reiterated that “[i]t’s just background information[,]” and that it was “not trying to establish what every [actor] does[,]” and limited lines of inquiry to First Tennessee Bank specifically. See, e.g., J.A. 1376, 1384, 1512, 1517. The majority opinion’s suggestion that challenges to any broad, industry-level testimony were waived is thus misplaced.
More importantly, objections aside, looking to the testimony that First Tennessee Bank proffered on objective good faith, I must conclude that the scant evidence fails to support the bankruptcy court’s objective good faith finding. Specifically, the Trustee identified multiple red flags, asserting that First Tennessee Bank’s response to those red flags failed to comport with that of a reasonable warehouse lender. The Trustee argues that First Tennessee Bank failed to carry its burden of proof and that the bankruptcy court erred in finding that “the bank’s actions were in accord with ... the industry’s usual practices.” In re Taneja, 08-13293-RGM, 2012 WL 3073175, at *15 (Bankr.E.D.Va. July 30, 2012). After carefully reviewing the record, I cannot even discern what those industry practices are, let alone find evidence that First Tennessee Bank’s actions comported with them.
Turning to some of these red flags, the Trustee asserted, for example, that at a meeting between First Tennessee Bank and FMI’s counsel, Mr. Garrett specifically asked whether FMI’s loans were fraudulent. Mr. Garrett then testified that in response, FMI’s counsel indicated that the loans were valid, and that First Tennessee Bank relied on the statement and followed up by “looking] at property, pull[ing] appraisals, [and] saw FMI listed as the mortgagor on some of them.” J.A. 1489. What is missing from the record is any shred of evidence that First Tennessee Bank’s reliance and investigation comported with those of a reasonable warehouse lender in light of industry standards. In other words, the bankruptcy court had no support for a finding that despite First Tennessee Bank’s own concerns that FMI’s loans might be fraudulent, it received all the relevant transfers in not only subjective, but also objective, good faith.
A second example: The Trustee highlighted that FMI belatedly delivered collateral documents it was required to transmit. As the majority opinion notes, “Garrett testified that a new borrower’s untimely delivery of such documents was ‘common’ and was ‘consistent’ with the practices of other investors and warehouse lending customers at the inception of their business relationship.” Ante at 432. But that experience was “common” and “consistent” only with First Tennessee Bank’s customers and “what we’re dealing with.... ” J.A. 1491. The testimony centered on “all of your”-i.e., First Tennessee Bank’s-“customers,” J.A. 1506, and was “[b]ased on your experience.... ” Id.; see also, e.g., J.A. 1543 (Q: “Mr. Daugherty, do most of your customers get you the full collateral package within two days?” A: “No.” (emphasis added)). Missing from the record is objective evidence regarding standard industry practices and how FMI’s delays and First Tennessee Bank’s response to those compared to those industry practices.
A third example: The Trustee asserted that FMI’s attributing its failure to sell loans to an employee’s having gone on vacation and then not returning constituted a red flag. Mr. Daugherty testified that he believed this excuse and had no reason to suspect that it was not the truth. Even the bankruptcy court called the explanation “unusual.” In re Taneja, 2012 WL 3073175, at *13. Yet First Tennessee Bank offered no evidence about how a *438 reasonable warehouse lender would have responded or whether its response comported with that industry standard.
For various red flags the Trustee raised, the majority opinion ascribes much to the fact that the lending and mortgage industries were in turmoil in 2007 and 2008. Surely no one doubts that the entire economy was in a state of upheaval during that time. But that fact tells us little about whether a business’s conduct in the face of alleged red flags, even if in a time of crisis, comported with industry practices and standards. If economic turmoil gives businesses a free pass on needing to prove objective good faith, even businesses falling far short of industry standards but rather “wil[l]ful[ly] ignoran[t] in the face of facts which cried out for investigation[,]” In re Nieves, 648 F.3d at 241, could succeed with a good faith defense so long as their implosion coincided with an economic downtown. This is not, and should not be, the law.
IV.
In sum, I agree with the majority that “ ‘[djeference to the bankruptcy court’s findings is particularly appropriate when ... the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility determinations.’ ” Ante at 434 (quoting Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors, 453 F.3d 225, 235 (4th Cir.2006)). But the issue here is not that, or how, the bankruptcy court assessed credibility or weighed testimony. Instead, the issue is whether First Tennessee Bank, which bore the burden of proof, failed to proffer any evidence or elicit any testimony to support a finding that it received transfers from FMI with objective good faith in the face of certain alleged red flags. It did. And because findings unsupported by the record must be overturned on clear error review, I would reverse the unsupported objective good faith finding, a necessary component of First Tennessee Bank’s good faith defense under 11 U.S.C. § 548(c). Accordingly, I respectfully dissent.

. That being said, I find the suggestion that expert testimony might somehow bungle "the presentation of a defense that ordinarily is based on the facts and circumstances of each case and on a particular witness' [sic] knowledge of the significance of such evidence[,]” ante at 431, troubling. Indeed, that suggestion seems to fly in the face of the very point of the good faith defense's objective component-which is based not on case-specific facts or fact witness views, but rather on what the transferee knew or should have known, "taking into consideration the customary practices of the industry in which the transferee operates.” In re Nieves, 648 F.3d at 240.