Eugene V. KLEIN, d/b/a Del Rayo Racing Stable, Plaintiff–Appellee,

v.

PEPSICO, INC., Defendant–Appellant,

and

Universal Jet Sales, Inc., Defendant–Appellee.

Eugene V. KLEIN, d/b/a Del Rayo Racing Stable, Plaintiff–Appellee,

v.

UNIVERSAL JET SALES, INC., Defendant–Appellant,

and

PepsiCo, Inc., Defendant–Appellee.

Eugene V. KLEIN, d/b/a Del Rayo Racing Stable, Plaintiff–Appellant,

v.

UNIVERSAL JET SALES, INC., and PepsiCo, Inc., Defendant–Appellees.

Nos. 87–1086(L), 87–1094 and 87–1095.

United States Court of Appeals, Fourth Circuit.

Argued March 10, 1988.

Decided April 25, 1988.

---

Arthur S. Friedman (Peter N. Wang, Friedman, Wang & Bleiberg, P.C., Craig C.

Reilly, Murphy, McGettigan & West, James F. Burnett, Potter, Anderson & Corroon, E. Milton Farley, III, Hunton & Williams on brief), for appellants.

David N. Webster (Earl C. Dudley, Jr., Terrance G. Reed, Nussbaum, Owen & Webster, Robert E. Sevila, Douglas L. Fleming, Jr., Hanes, Sevila, Saunders & McCahill on brief), for appellees.

Before SPROUSE and ERVIN, Circuit Judges, and BRITT, Chief District Judge for the Eastern District of North Carolina, sitting by designation.

ERVIN, Circuit Judge:

This case turns on whether a contract was formed between Universal Jet Sales, Inc. ("UJS") and PepsiCo, Inc., ("PepsiCo") for the sale of a Gulfstream G–II corporate jet to UJS for resale to one Eugene V. Klein. If a contract was formed, the question remains whether the district court acted within his discretion by ordering specific performance of the contract. We believe the district court properly found that a contract was formed; however, we conclude that the remedy of specific performance is inappropriate. Accordingly, we affirm in part, reverse and remand in part.

I.

In March 1986, Klein began looking for a used corporate jet; specifically, he wanted a G–II. He contacted Patrick Janas, President of UJS, who provided information to Klein about several aircraft including the PepsiCo aircraft. Klein's pilot and mechanic, Mr. Sherman and Mr. Quaid, inspected the PepsiCo jet in New York. Mr. James Welsch served as the jet broker for Pepsi-Co.

Klein asked that the jet be flown to Arkansas for his personal inspection. On March 29, 1986, he inspected the jet. Mr. Rashid, PepsiCo Vice President for Asset Management and Corporate Service, accompanied the jet to Arkansas and met Mr. Klein. Janas also went to Arkansas. Klein gave Janas $200,000 as a deposit on

the jet, and told Janas to offer $4.4 million for the aircraft.

On March 31, 1986, Janas telexed the $4.4 million offer to Welsch. The telex said the offer was subject to a factory inspection satisfactory to the purchaser, and a definitive contract. On April 1, PepsiCo counteroffered with a $4.7 million asking price. After some dickering, Welsch offered the jet for $4.6 million. Janas accepted the offer by telex on April 3. Janas then planned to sell the aircraft to Klein for $4.75 million. In Finding of Fact number 18, JA 85, Judge Williams declared that a contract had been formed at this point.

Judge Williams ruled that a contract was evidenced by Janas' confirming telex which "accepted" PepsiCo's offer to sell the jet, and noted that a $100,000 down payment would be wired. The telex also asked for the proper name of the company selling the aircraft. See JA 86 Finding of Fact number 22.

On April 3, Janas sent out copies of the Klein/UJS agreement and the UJS–PepsiCo agreement to the respective parties. Janas also sent a bill of sale to PepsiCo (to Rashid). PepsiCo sent the bill of sale to the escrow agent handling the deal on April 8. Mr. Rochoff, PepsiCo's corporate counsel, spoke with Janas about the standard contract sent by Janas to PepsiCo. He noted only that the delivery date should be changed.

On Monday, April 7, the aircraft was flown to Savannah, Georgia for the pre-purchase inspection. Quaid was present at the inspection for Klein. Archie Walker, PepsiCo's chief of maintenance, was present for the seller. Walker and Quaid discussed a list of repairs to be made to the jet. Most of the problems were cured during the inspection. However, one cosmetic problem was to be corrected in New York, and there were cracks in the engine blades of the right engine.

On April 8, a boroscopic examination conducted by Aviall revealed eight to eleven cracks on the turbine blades. Walker told Rashid that the cost of repairing the blades would be between $25,000 to $28,000. Judge Williams found in Finding of Fact

numbers 34 through 37 that PepsiCo, through Walker and Rashid, agreed to pay for the repair to the engine.

On April 9, the plane was returned to New York. Rashid wanted the plane grounded; however, it was sent to retrieve the stranded PepsiCo Chairman of the Board from Dulles airport that same evening. Donald Kendall, the Chairman, on April 10, called Rashid and asked that the jet be withdrawn from the market. Rashid called Welsch who effected the withdrawal. On the 11th Janas told Klein that PepsiCo refused to tender the aircraft. The deal was supposed to close on Friday, April 11.

On April 14, Klein telexed UJS demanding delivery of the aircraft. That same day, UJS telexed PepsiCo demanding delivery and expressing satisfaction with the pre-purchase inspection. On April 15, PepsiCo responded with a telex to UJS saying that it refused to negotiate further because discussions had not reached the point of agreement; in particular, Klein was not prepared to go forward with the deal.

Judge Williams, in a lengthy opinion, made numerous findings of fact. Such findings are reviewed only for clear error. *Davis v. Food Lion*, 792 F.2d 1274, 1277 (4th Cir.1986). If the findings are based on determinations of witness credibility, are consistent, and are corroborated by extrinsic evidence, they are virtually never clearly erroneous. *Brown v. Baltimore and Ohio R. Co.*, 805 F.2d 1133, 1140 (4th Cir. 1986).

Judge Williams' decision to grant specific performance is reviewed only for an abuse of discretion. *Haythe v. May*, 223 Va. 359, 288 S.E.2d 487 (1982); *Horner v. Bourland*, 724 F.2d 1142, 1144–45 (5th Cir.1984). Keeping these standards in mind, we now turn to the first issue, whether the district court clearly erred in finding that a contract arose between PepsiCo and UJS.

## II.

■ PepsiCo argues forcefully that no contract was formed between it and UJS. The soft drink dealer argues first that the parties did not intend to be bound until a

complete integration was written in final form. Until that definitive written contract existed, PepsiCo maintains that no contract existed. The company argues that the March 31 and April 1 telexes explicitly stated that no contract would exist until a written agreement was executed. Because no written agreement had been executed (PepsiCo had not signed the sales agreement sent by Janas to PepsiCo) the company argues that it had the right to withdraw from the negotiations. PepsiCo cites *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir.1984), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) and *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 815–16 (7th Cir.1987) for the general proposition that either party can withdraw from negotiations for any reason.

Upon reviewing the facts, Judge Williams ruled that a contract was formed between the parties. He explains:

> A contract was formed between UJS and PepsiCo for the sale of the GII aircraft, Serial No. 170, for $4.6 million. The contract formation is based upon (1) UJS's April 3rd confirming telex; (2) the conduct of the parties, e.g., (a) PepsiCo's failure to communicate any objection to the terms of the April 3rd telex confirming the agreement reached between Welsch and Janas; (b) PepsiCo's directive to UJS to wire transfer a One Hundred Thousand Dollar ($100,000.00) down payment, which money was received by PepsiCo; (c) PepsiCo's communication with UJS that the Sales Agreement, which served to memorialize the contract, appeared "fine"; (d) PepsiCo's execution of the Bill of Sale for the aircraft and its sending of the Bill of Sale to the escrow agent, as called for by Janas and in the Sales Agreement; (e) PepsiCo's sending the aircraft to Savannah, Georgia, for a prepurchase inspection as called for in both the April 3rd confirming telex and the Sales Agreement; and (e) admissions of PepsiCo., through Rash-

id, that UJS's offer to purchase the airplane was accepted.

JA 103–04, Conclusion of Law # 6. Finally, Judge Williams expressly held that the intent to memorialize the contract in writing was not necessarily a condition to the existence of the contract itself. JA 104 (Conclusion of Law number 8).

PepsiCo offers no reason as to why Judge Williams' findings on this issue are clearly erroneous. They merely disagree with his characterizations of the facts. This court may disagree with his characterization too, but that does not amount to a firm and definite conviction that a mistake has been committed. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ PepsiCo argues secondly, that no contract was formed because the condition of inspection satisfactory to the buyer had not been met. PepsiCo urges strongly that neither UJS nor Klein were willing to accept the aircraft "as is," so the condition was unsatisfied. Judge Williams ruled that when PepsiCo agreed to make the repairs, the condition was satisfied. Furthermore, the court below ruled that the condition was excused by PepsiCo's refusal to tender the aircraft so that the buyer could express his dissatisfaction.

The district court's first ruling, that the condition was satisfied by PepsiCo's offers to pay for the repairs, resolves this issue. Judge Williams ruled that based on the conversations between Walker and Rashid, the seller had agreed to make the necessary repairs to market the plane. See Finding of Fact 34–37 at JA 89–90. Again, PepsiCo offers no suggestion that Judge Williams committed any error, much less clear error. Rather, PepsiCo urges its version of the facts on this court. Without more, the company loses.

Ultimately, then, a contract exists between PepsiCo and UJS for the sale of one G–II Gulfstream aircraft.[1] Because Pepsi-

---

1. PepsiCo argues that Klein has no right to sue on the PepsiCo/UJS contract because (1) the contract violates the statute of frauds, (2) Klein was not an intended beneficiary of the contract, and (3) the Klein/UJS contract, from which Klein derives his right to sue PepsiCo, was rescinded. The district court's discussion thoroughly and ably treats these claims and rejects them. Based on the district court's reasoning, this court affirms the disposition of those issues.

Co failed to deliver the aircraft, the district court ordered relief in the form of specific performance. We now consider the appropriateness of the relief ordered.

### III.

The Virginia Code § 8.2–716 permits a jilted buyer of goods to seek specific performance of the contract if the goods sought are unique, or in other proper circumstances. Judge Williams ruled that: 1) the G–II aircraft involved in this case is unique and 2) Klein's inability to cover with a comparable aircraft is strong evidence of "other proper circumstances." JA 111–112, Conclusions of Law No. 31 and No. 32. These conclusions are not supported in the record.

■■■ We note first that Virginia's adoption of the Uniform Commercial Code does not abrogate the maxim that specific performance is inappropriate where damages are recoverable and adequate. *Griscom v. Childress*, 183 Va. 42, 31 S.E.2d 309, 311 (1944). In this case Judge Williams repeatedly stated that money damages would make Klein whole. JA 668–9, 582. Klein argued that he wanted the plane to resell it for a profit. JA 669. Finally, an increase in the cost of a replacement does not merit the remedy of specific performance. *Hilmor Sales Co. v. Helen Neuschalfer Division of Supronics Corp.*, 6 U.C.C.Rep.Serv. 325 (N.Y.Sup.Ct.1969). There is no room in this case for the equitable remedy of specific performance.

■■ Turning now to the specific rulings of the court below, Judge Williams explained that the aircraft was unique because only three comparable aircraft existed on the market. Therefore, Klein would have to go through considerable expense to find a replacement. JA 110. Klein's expert testified that there were twenty-one other G–II's on the market, three of which were roughly comparable. JA 838–9, 1284–88. Klein's chief pilot said that other G–II's could be purchased. JA 259. Finally, we should note that UJS bought two G–II's which they offered to Klein after this deal fell through, JA 796–7, and Klein made bids on two other G–II's after Pepsi-

Co withdrew its aircraft from the market. JA 277, 666, 694. Given these facts, we find it very difficult to support a ruling that the aircraft was so unique as to merit an order of specific performance.

Judge Williams ruled further that Klein's inability to cover his loss is an "other proper circumstance" favoring specific performance. Klein testified himself that he didn't purchase another G–II because prices had started to rise. JA 693. Because of the price increase, he decided to purchase a G–III aircraft. As noted earlier, price increases alone are no reason to order specific performance. Because money damages would clearly be adequate in this case, and because the aircraft is not unique within the meaning of the Virginia Commercial Code, we reverse the grant of specific performance and remand the case to the district court for a trial on damages.

*AFFIRMED IN PART, REVERSED AND REMANDED IN PART.*