**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-1058**

———————

In Re:  VIJAY K. TANEJA,

　　　　　　　Debtor.

-----------------------

H. JASON GOLD, Chapter 11 Liquidating Trustee,

　　　　　　　Plaintiff – Appellant,

　　　v.

FIRST TENNESSEE BANK NATIONAL ASSOCIATION,

　　　　　　　Defendant - Appellee.

———————

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.　Anthony J. Trenga,
District Judge.　(1:12-cv-01097-AJT-TRJ; 08-13293-RGM; 10-01225-
RGM)

———————

Argued:  October 29, 2013　　　　Decided:  February 21, 2014

———————

Before KEENAN, WYNN, and THACKER, Circuit Judges.

———————

Affirmed by published opinion.  Judge Keenan wrote the opinion,
in which Judge Thacker concurred.  Judge Wynn wrote a separate
dissenting opinion.

———————

**ARGUED**: Kenneth Oestreicher, WHITEFORD, TAYLOR & PRESTON, LLP,
Baltimore, Maryland, for Appellant.  Clarence A. Wilbon, BASS,
BERRY & SIMS PLC, Memphis, Tennessee, for Appellee.  **ON BRIEF**:

Todd M. Brooks, Baltimore, Maryland, Christopher A. Jones, WHITEFORD, TAYLOR & PRESTON, LLP, Falls Church, Virginia, for Appellant. Annie T. Christoff, BASS BERRY & SIMS PLC, Memphis, Tennessee; Sheila DeLa Cruz, HIRSCHLER FLEISCHER, PC, Richmond, Virginia, for Appellee.

———————————

BARBARA MILANO KEENAN, Circuit Judge:

In this bankruptcy case, the trustee for the bankruptcy estates of Vijay K. Taneja and Financial Mortgage, Inc. (FMI) filed an action to avoid and recover certain payments made by FMI to First Tennessee Bank, National Association (the bank, or First Tennessee). In the complaint, the trustee alleged that the payments were "fraudulent transfers" under 11 U.S.C. § 548, and were part of a fraudulent scheme carried out by FMI and Taneja. After a trial, the bankruptcy court determined that the bank proved the affirmative defense of good faith in accordance with Section 548(c) and dismissed the trustee's action. The district court affirmed that decision, and the trustee appeals.

The primary question presented is whether the bank proved its good-faith defense based on the testimony of two bank employees. Upon our review, we conclude that the bankruptcy court and the district court correctly applied the objective good-faith standard in determining that the bank employees' testimony provided competent objective evidence that satisfied the bank's burden of proving its affirmative defense under Section 548(c). We further conclude that the bankruptcy court did not clearly err in holding that the bank accepted the payments from FMI in good faith. Accordingly, we affirm the district court's judgment.

I.

In the 1990's, Taneja began operating FMI, a legitimate business engaged in originating home mortgages and selling those loans to investors (secondary purchasers), who aggregated the mortgage loans and often securitized them for sale to different investors. To carry out its business, FMI worked with numerous financial institutions known as "warehouse lenders." Typically, these lenders extended lines of credit and advanced funds to FMI, in order that FMI could extend mortgage loans to individual mortgagees. The warehouse lenders required FMI to sell the mortgage loans to secondary purchasers within a certain time period. After the sale, the warehouse lenders' lines of credit were "replenished according to the terms of the agreement."

The record shows that at some point after 1999, FMI and Taneja had difficulty selling their mortgage loans to secondary purchasers. As a result, FMI and Taneja began engaging in fraudulent conduct, which included selling the same mortgage loans to several different secondary purchasers and conspiring with other business entities controlled by Taneja to have them serve as intermediary parties to conceal the fraud. The fraudulent conduct continued during 2007 and 2008, when the market for "mortgage-backed securities" declined significantly. Even though FMI and Taneja also continued to conduct certain legitimate business activities, their fraudulent conduct

4

resulted in losses of nearly $14 million to warehouse lenders, and of about $19 million to secondary purchasers.[1]

FMI's relationship with First Tennessee, a warehouse lender, began in 2007 when the bank received a referral concerning FMI from another warehouse lender. Before extending FMI a line of credit, the bank analyzed financial statements and tax returns submitted by FMI and Taneja. The bank also conducted research using "a private mortgage database" that contained various information regarding mortgage irregularities, reports of fraud, and material suspicions of fraud. Additionally, the bank contacted FMI's references and examined FMI's "quality control plan." The bank's investigation did not reveal any negative business information involving FMI or Taneja.

On July 2, 2007, the bank and FMI executed an agreement in which the bank provided FMI with a line of credit in the amount of $15 million (the lending agreement). However, their lending relationship was short-lived, and the bank ultimately made advances to FMI for a period of only about four months, between August and early November 2007.

---

[1] These figures represent the losses that Taneja admitted in connection with his individual criminal conviction arising from these activities.

5

The lending agreement obligated the bank to send funds directly to an insured title agent. After each mortgage loan closed, FMI was required to send certain documents to the bank within two business days, including the mortgagor's promissory notes associated with the loans originated by FMI. Although FMI periodically did not meet this two-day timeline, FMI eventually provided to the bank the original promissory note for each loan, which was the most critical security document underlying each transaction.

In September 2007, FMI submitted three repayments to the bank, totaling about $1 million. However, by mid-October 2007, FMI owed about $12 million of funds advanced on its line of credit with the bank. Thereafter, the bank suspended payment of any additional advances to FMI.

On November 1, 2007, Robert A. Garrett, the bank's executive vice president of mortgage warehouse lending, and Benjamin Gaither Daugherty, III, the bank's vice president and relationship manager of the bank's warehouse lending group, met with Taneja at FMI's place of business. Garrett and Daugherty explained to Taneja that FMI needed to sell its mortgage loans to secondary purchasers and "clear" the line of credit. In response, Taneja informed the bank's representatives that FMI's failure to produce timely, adequate documentation to complete mortgage loans sales to secondary purchasers was caused by the

6

unexpected departure of one of FMI's loan processors. In the absence of such mortgage loan documentation, a secondary purchaser would not purchase the mortgage obligations, especially during the difficult market conditions in 2007.

After this meeting, Garrett further investigated FMI's "dragging" mortgage loan sales by contacting a representative of Wells Fargo, FMI's chief customer and secondary purchaser, to inquire about FMI's unsold loans. Garrett reviewed each outstanding loan with the Wells Fargo representative, who informed Garrett that Wells Fargo had not purchased FMI's outstanding loans because the supporting documentation had not been provided.

In November and December 2007, FMI made six principal payments and one interest payment to the bank, in the total amount of about $2.8 million. In January 2008, Garrett and Daugherty met again with Taneja at FMI's office to address the outstanding balance of advanced funds. According to Garrett, he and Daugherty planned to obtain the files from FMI for its unsold mortgage loans to sell the loans directly to secondary purchasers. However, Taneja proposed that the parties engage in a "collateral swap," in which Taneja would sell other real estate to "pay the bank off." Taneja represented that the mortgage loans had lost value, and that Taneja did not want to sell them until their value increased.

7

During the January 2008 meeting, Taneja's attorney informed Garrett, "You don't want these loans." Garrett immediately asked Taneja's attorney whether FMI's loans were valid, and whether there was "any fraud involved in these loans." Taneja's attorney assured Garrett that there was "no problem," and that the mortgage loans were "good" and represented "arms-length transactions."

After this meeting, Garrett and Daugherty visited numerous properties that served as security for FMI's mortgage loans. They also reviewed appraisals for some of the properties, and confirmed that FMI was listed as the mortgagor on the deeds of trust placed on those properties. After reviewing these materials, Garrett and Daugherty again met with Taneja's attorney and reiterated the importance of confirming that the mortgage loans were "real." Taneja's attorney represented that "there is not a problem." The bank ultimately approved a forbearance agreement with FMI, in which Taneja agreed to provide additional collateral to secure the bank's interests.

In February and March 2008, FMI transferred to the bank two interest payments, in the total amount of about $76,000, which were the final payments at issue in this appeal. In April 2008, the bank learned that the deeds of trust securing the mortgage notes held by the bank were not valid and had been falsified.

8

The bank immediately declared FMI in default under the lending agreement.

As a result of the bank's relationship with FMI and Taneja, the bank lost more than $5.6 million. Taneja's conduct later resulted in his conviction for conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(h). He received a sentence of 84 months' imprisonment and was ordered to pay restitution in the amount of $33,162,291. See Gold v. Gateway Bank, FSB, No. 1:12-cv-264, 2012 U.S. Dist. LEXIS 109337 (E.D. Va. July 3, 2012).

In June 2008, Taneja and his corporate affiliates, including FMI, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. H. Jason Gold, who was appointed as the trustee for the debtors (the trustee), filed an adversary proceeding in the bankruptcy court against the bank in accordance with 11 U.S.C. §§ 548(a) and 550(a). In the complaint, the trustee sought to avoid and recover the funds that FMI transmitted to the bank in the twelve payments described above, which totaled nearly $4 million, on the ground that the funds were conveyed fraudulently.

In response, the bank contended that it received the payments from FMI for value and in good faith. In accordance with 11 U.S.C. § 548(c), the bank pleaded good faith as an

9

affirmative defense. The case proceeded to trial in the bankruptcy court.

During a three-day trial, the bankruptcy court heard testimony and received substantial documentary evidence regarding the fraudulent conduct of FMI and Taneja. In asserting its good-faith defense, the bank relied on the testimony of Garrett and Daugherty. Although the bank did not seek to qualify these witnesses as experts, both Garrett and Daugherty were permitted without objection to testify about their knowledge of the warehouse lending industry based primarily on their long careers with the bank and other institutions.

Garrett, who had worked for the bank for 14 years, and had worked in the banking business for about 30 years, testified about his experience initiating "warehouse lending groups" at the bank and at two other financial institutions. Garrett also testified about his work developing software used by the bank and other lending institutions to manage and operate their warehouse lending businesses.

With regard to the warehouse lending industry, Garrett stated that as part of his responsibilities at the bank, he monitors industry publications and often serves as a speaker at industry conferences. Garrett stated that, in 2007 and 2008, the secondary mortgage market was "imploding." He explained

10

that at the end of July 2007, "the secondary market for non-agency mortgage-backed securities came back no bid," which meant that "if you owned a mortgage-backed security you didn't have a market on which to sell it." Garrett further explained that during this period, secondary purchasers began "constricting their underwriting criteria." According to Garrett, these narrowed criteria created more restrictive standards for mortgage bankers to meet. Garrett testified that during the "market meltdown," successful sales of loans to secondary purchasers depended on the effective "build[ing] [of] a loan file," and on finding parties to purchase the mortgage loans.

Daugherty began working for the bank in 1988. During the relevant period in 2007 and 2008, he served as the bank's primary contact with FMI. Daugherty testified that he was familiar with the general practices of the warehouse lending industry, and with the particular market turmoil of 2007 and 2008. Daugherty stated that, during this period, it was common for a secondary purchaser to spend additional time determining whether to buy various mortgage loans, and that this additional review process increased the time required to complete a sale of those instruments. He also stated that during the "market meltdown," more loans remained outstanding on the bank's warehouse lines of credit than ever had been the case in previous years.

11

After trial, the bankruptcy court issued a comprehensive memorandum opinion, concluding that even if the trustee could establish that the payments at issue were fraudulent, the bank had shown that it accepted the payments in good faith.[2] The bankruptcy court determined that although the bank was concerned about FMI's failure to sell its loans quickly in late 2007, the bank reasonably thought that the lagging secondary mortgage market, rather than any inappropriate conduct by FMI and Taneja, was the cause of the delayed sales.

The bankruptcy court also addressed many other details of the relationship between the bank and FMI, and concluded that the bank "did not have any information that would [reasonably] have led it to investigate further, and the bank's actions were in accord with the bank's and the industry's usual practices." With regard to the bank's witnesses, Garrett and Daugherty, the bankruptcy court stated that they were

> knowledgeable in the bank's practices, the bank's relationship with FMI, the transactions in issue and the mortgage warehouse industry. [Garrett's and Daugherty's] testimony was credible that at the time of each transfer, the bank did not have any actual knowledge of the fraud Taneja was perpetrating on it and others, did not have any information that would [reasonably] have led it to investigate further, and

---

[2] The bankruptcy court also determined that the trustee was not entitled to a "Ponzi scheme presumption," which would have relieved the trustee of the burden of proving that each transaction was made with the intention to hinder, delay, or defraud creditors.

the bank's actions were in accord with the bank's and the industry's usual practices.

In reaching this conclusion, the bankruptcy court acknowledged that Garrett and Daugherty were the employees responsible for the bank's warehouse lending and transactions with FMI, but stated that the court had considered these factors in assessing whether their employment and job conduct may have affected their credibility. The court concluded that the testimony of Garrett and Daugherty sufficiently established the required components of the bank's good-faith defense.

Having concluded that the bank established its good-faith affirmative defense under Section 548(c), the bankruptcy court dismissed the trustee's adversary action. The district court affirmed that decision, and the trustee filed a timely appeal in this Court.

II.

We review de novo the legal conclusions of the bankruptcy court and the district court. In re Alvarez, 733 F.3d 136, 140 (4th Cir. 2013). Like the district court, we review for clear error the factual findings of the bankruptcy court. Id.

A bankruptcy court's decision that a defendant has met its burden of proving a good-faith defense is primarily a factual determination, which is subject to review for clear error. See

13

In re Armstrong, 285 F.3d 1092, 1096 (8th Cir. 2002). Under this standard, we will not reverse a bankruptcy court's factual finding that is supported by the evidence unless that finding is clearly wrong. In re ESA Envtl. Specialists, Inc., 709 F.3d 388, 399 (4th Cir. 2013). We will conclude that a finding is clearly erroneous only if, after reviewing the record, we are left with "a firm and definite conviction that a mistake has been committed." Klein v. PepsiCo, Inc., 845 F.2d 76, 79 (4th Cir. 1988) (citation omitted).

On appeal, the trustee challenges the bankruptcy court's determination that the bank established its good-faith defense under Section 548(c). The trustee asserts two related arguments: (1) that the court erred as a matter of law by misapplying the objective good-faith standard; and (2) that the court clearly erred in concluding that the bank presented sufficient objective evidence to prove that it accepted the relevant payments in good faith. We address these arguments in turn.

Under Section 548(a), a bankruptcy trustee can avoid a transfer of a debtor's property if the debtor "made such transfer . . . with intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). However, Section 548(c) provides that:

14

> a transferee . . . of such a transfer . . . that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

This provision provides a transferee with an affirmative defense to the trustee's avoidance action if the transferee meets its burden to show that it accepted the transfers "for value and in good faith." 11 U.S.C. § 548(c); see Perkins v. Haines, 661 F.3d 623, 626 (11th Cir. 2011). Because the "for value" element is not at issue in the present case, we focus only on the issue whether the bank satisfied its burden of proving that it accepted the transfers in good faith.

Although the Bankruptcy Code does not define the term "good faith," this Court recently interpreted the term in the context of an affirmative defense asserted under 11 U.S.C. § 550(b)(1). See Goldman v. City Capital Mortg. Corp. (In re Nieves), 648 F.3d 232, 237 (4th Cir. 2011). That section provides a good faith-defense permitting a transferee to bar a trustee from recovering funds involving transfers that have been deemed avoidable under Section 548 or certain other provisions of the Bankruptcy Code. 11 U.S.C. § 550(a), (b)(1); see In re Nieves, 648 F.3d at 237. In material part, Section 550(b)(1) states that an affirmative defense is established when a transferee of avoidable property takes the transfer "for value . . . in good

15

faith, and without knowledge of the voidability of the transfer avoided."

In our decision in In re Nieves, we determined that the proper focus in evaluating good faith in the context of a bankruptcy avoidance action requires that a court determine "what the transferee [actually] knew or should have known" when it accepted the transfers.  Id. at 238 (citation omitted).  We observed that general principles of good faith in other areas of commercial law aided our refinement of this term in the bankruptcy context, and we concluded that "good faith" has both "[1] subjective ('honesty in fact') and [2] objective ('observance of reasonable commercial standards') components." Id. at 239.  We articulated the standard for a good-faith defense in that bankruptcy proceeding as follows:

> Under the subjective prong, a court looks to "the honesty" and "state of mind" of the party acquiring the property.  Under the objective prong, a party acts without good faith by failing to abide by routine business practices.  We therefore arrive at the conclusion that the objective good-faith standard probes what the transferee knew or should have known taking into consideration the customary practices of the industry in which the transferee operates.

Id. at 239-40 (citations omitted).

We conclude that the good-faith standard adopted in In re Nieves is applicable to the establishment of a good-faith defense under Section 548(c).  Therefore, in evaluating whether a transferee has established an affirmative defense under

16

Section 548(c), a court is required to consider whether the transferee actually was aware or should have been aware, at the time of the transfers and in accordance with routine business practices, that the transferor-debtor intended to "hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." See id. at 238; 11 U.S.C. § 548(a)(1)(A).

In the present case, the trustee does not assert that the bank actually knew about FMI's and Taneja's fraudulent conduct before April 2008. Thus, we confine our consideration to the issue whether the bank should have known about the fraudulent conduct of FMI and Taneja, "taking into consideration the customary practices of the industry in which the [bank] operates." See In re Nieves, 648 F.3d at 240.

Both the bankruptcy court and the district court in the present case applied the good-faith standard from In re Nieves in conducting their analyses. The trustee contends, however, that those courts erred in applying that standard, and asserts that the bank, as a matter of law, was unable to prove good faith without showing that "each and every act taken and belief held" by the bank constituted "reasonably prudent conduct by a mortgage warehouse lender." Additionally, the trustee asserts that such evidence "likely" should have been presented in the form of third-party expert testimony. We disagree with the trustee's arguments.

17

While the trustee correctly observes that the objective good-faith standard requires consideration of routine business practices, the trustee's position well exceeds the requirement that a court consider "the customary practices of the industry in which the transferee operates." See id. We decline to adopt a bright-line rule requiring that a party asserting a good-faith defense present evidence that his every action concerning the relevant transfers was objectively reasonable in light of industry standards. Instead, our inquiry regarding industry standards serves to establish the correct context in which to consider what the transferee knew or should have known.[3]

In addition, we decline to hold that a defendant asserting a good-faith defense must present third-party expert testimony in order to establish prevailing industry standards. Although certain cases may warrant, or even require, such specialized testimony, an inflexible rule that expert testimony must be presented in every case to prove a good-faith defense unreasonably would restrict the presentation of a defense that ordinarily is based on the facts and circumstances of each case and on a particular witness' knowledge of the significance of

---

[3] In asserting that the bankruptcy court and district court misapplied the objective good-faith standard, the trustee relies heavily on the standard as articulated in Christian Brothers High School Endowment v. Bayou No. Leverage Fund, LLC (In re Bayou Group), 439 B.R. 284 (S.D.N.Y. 2010), an out-of-circuit district court opinion that has no precedential value here.

18

such evidence.  See Meeks v. Red River Entm't (In re Armstrong), 285 F.3d 1092, 1096 (8th Cir. 2002) (no precise definition for good faith, which should be decided based on case-by-case basis); Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 984 (1st Cir. 1983) (same).  Accordingly, we decline to consider the trustee's argument further and hold that the bankruptcy court and the district courts applied the correct legal standard in evaluating whether the bank proved its good-faith defense.

We next address the trustee's argument that the bank presented insufficient objective evidence to negate a finding that, when the bank accepted FMI's payments, the bank "should have known" about FMI's and Taneja's fraudulent conduct.  The trustee points to several circumstances that it submits should have alerted the bank to FMI's and Taneja's fraudulent conduct. The trustee also contends that because the bank's witnesses who testified about these circumstances were bank employees, the bank's evidence of good faith constituted purely subjective evidence.  We disagree with the trustee's arguments.

We observe, in accordance with our holding above, that the objective component of the good-faith defense may be established by lay or expert testimony, or both, depending on the nature of the evidence at issue.  Here, the parties' dispute centered on the general practices in the warehouse lending industry and the

19

indicators of fraudulent conduct, if any, that were apparent from the particular facts known to the bank's officials.

Both Garrett and Daugherty had extensive knowledge of industry practices, including the common practices involved in warehouse lender-borrower relationships, and both were able to explain their reasons why FMI's and Taneja's conduct did not raise indications of fraud despite FMI's failure to sell their mortgage loans in the secondary market in a timely manner. Their testimony also described the severe decline in the market for mortgage-backed securities in 2007 and 2008, which provided additional objective evidence of the state of the warehouse lending industry during that period. In light of their extensive experience in the warehouse lending industry and their knowledge of the particular events at issue, Garrett's and Daugherty's employment status did not affect the admissibility of their testimony or otherwise indicate that expert testimony was required on the objective component of the good-faith defense.

We also observe that the bankruptcy court explicitly stated that it considered the fact that Garrett and Daugherty were employed by the bank in assessing the weight to be given their testimony. Additionally, and significantly, the trustee did not object to the testimony by Garrett and Daugherty relating to the warehouse lending industry or the conditions in the market for

20

mortgage-backed securities in 2007 and 2008.[4]  See Fed. R. Evid. 103 (a party may not claim error regarding admitted evidence if he fails timely to object, unless the court plainly erred in admitting the evidence).  Thus, we reject the trustee's argument that Garrett and Daugherty, by virtue of their employment with the bank, did not provide competent evidence regarding the objective component of the bank's good-faith defense.

We therefore turn to discuss the evidence cited by the trustee, which he alleges should have signaled to the bank that FMI and Taneja were engaged in a fraudulent scheme, and consider whether the bank presented sufficient objective evidence of good faith with regard to these circumstances.  The trustee first points to FMI's delay in providing collateral documents to the bank in connection with some of FMI's mortgage loans.  However, Garrett testified that a new borrower's untimely delivery of such documents was "common" and was "consistent" with the practices of other investors and warehouse lending customers at the inception of their business relationship.  Also, Daugherty stated that borrowers typically had difficulty adjusting to new warehouse lending relationships, because "different warehouse

---

[4] Although the trustee raised objections regarding certain aspects of Garrett's and Daugherty's testimony regarding secondary purchasers and the marketability of unsold loans, the trustee did not object to their general testimony regarding industry standards or the conditions in the market in 2007 and 2008.

lenders require[d] different items." Critically, the evidence showed that the bank always received from FMI the most vital document, the original promissory note that perfected the holder's security interest. Thus, the record did not show that the bank should have known that the notes were fraudulent simply because they were not submitted within the two-day timeline required by the parties' lending agreement.

The trustee also submits that FMI's failure to sell many of its mortgage loans in the secondary market should have alerted a reasonable warehouse lender of fraudulent conduct. However, substantial evidence in the record refutes this argument. Both Garrett and Daugherty testified extensively about the "extraordinary time" that the warehouse lending industry was experiencing during 2007 and 2008. Not only did Daugherty explain that a borrower's failure to sell mortgage loans to secondary purchasers is "part of the business" of warehouse lending generally, but he also stated that this was particularly true during 2007 and 2008 when FMI was unable to sell many of its loans. Moreover, Garrett explained that it was common for mortgage bankers intentionally to delay selling their mortgage loans during this time, because they expected only a temporary market decline. Therefore, we conclude that the record contained sufficient objective evidence that FMI's failure to

22

sell its loans to secondary purchasers did not serve as a signal to the bank that FMI was engaging in fraudulent conduct.

This testimony concerning the curtailed market for mortgage-backed securities also refutes the trustee's argument that the bank should have known about FMI's and Taneja's fraudulent conduct because FMI, rather than secondary purchasers, directly made payments to the bank on certain loans. Under the terms of FMI's agreement with the bank, FMI was required to repay the bank regardless whether FMI had sold the loan obligations to secondary purchasers. And, notably, the trustee's key witness, Robert Patrick, who was retained to investigate FMI's financial affairs, acknowledged FMI's repayment obligation and testified that FMI's actions making direct payments to the bank were not an indication of fraudulent conduct.

The final two circumstances cited by the trustee arose from conversations that Garrett and Daugherty had with Taneja and his attorney during their October 2007 and January 2008 meetings.[5] During the first meeting, in which the parties discussed FMI's outstanding loans, Taneja explained that one of FMI's loan

---

[5] We do not address the trustee's assertion that the bank should have known about the fraud when the bank discovered FMI's fraudulent notes in April 2008. The transfers in question in this case occurred before April 2008; therefore, what the bank should have known, beginning in April 2008, is not relevant to our inquiry.

23

processors had left FMI unexpectedly, resulting in delays in FMI's production of its mortgage loan documentation. Contrary to the trustee's position, this explanation by Taneja did not signal fraudulent conduct when the evidence established that secondary purchasers had tightened their standards for loan documentation in 2007 and 2008, and that such purchasers would not purchase mortgage obligations with incomplete documentation. Additionally, Garrett confirmed with a representative of FMI's regular client and secondary purchaser, Wells Fargo, that the outstanding mortgage loans remained unsold because the loan documentation was incomplete. Thus, the bankruptcy court did not clearly err in concluding that the circumstances surrounding the October 2007 meeting did not show that the bank should have known about the fraudulent conduct.

During the meeting that occurred in January 2008, when Garrett asked Taneja's attorney whether FMI's unsold loans were fraudulent, the attorney responded that the loans were valid and executed in "arms-length" transactions. The bankruptcy court rejected the trustee's assertion that this conversation demonstrated that the bank should have known about the ongoing fraud. The court determined instead that Garrett properly accepted the attorney's response in light of the fact that the parties were attempting to "work out the problem of the unpaid advances on the line of credit," and that the bank was aware

24

that the value of the mortgage obligations had been significantly impaired. The record demonstrated that the decrease in the market value of mortgage loans in the secondary market was an industry-wide problem in 2007 and 2008. Moreover, after the January 2008 meeting, Garrett and Daugherty conducted additional investigation into the collateral securing some of FMI's loans and did not discover any problems at that time.

Based on this evidence, we conclude that the bankruptcy court did not clearly err in rejecting the trustee's position that the bank should have known about FMI's and Taneja's fraudulent conduct based on the conversation with Taneja's attorney at the January 2008 meeting. Rather, when considered as a whole, the circumstances relied on by the trustee indicated only that FMI had financial difficulties, which was not uncommon in the warehouse lending industry during 2007 and 2008. The bankruptcy court found that Garrett and Daugherty were credible and knowledgeable witnesses in their testimony about the warehouse lending industry. Accordingly, the bankruptcy court accepted their testimony regarding the devastating conditions of the mortgage-backed security market in 2007 and 2008, when the relevant payments by FMI were made. "Deference to the bankruptcy court's findings is particularly appropriate when, as here, the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility

25

determinations." Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation), 453 F.3d 225, 235 (4th Cir. 2006).

On this record, we are not left with a firm or definite conviction that the bankruptcy court erred in finding that the bank presented sufficient objective evidence of good faith. See Klein, 845 F.2d at 79. Thus, we hold that the bankruptcy court did not clearly err in concluding that the bank accepted the relevant transfers from FMI in good faith and without knowledge of facts that should have alerted the bank that the transfers were part of a fraudulent scheme.[6] See In re Nieves, 648 F.3d at 238.


## III.

In sum, we conclude that the district court and the bankruptcy court applied the correct legal principles relevant to evaluating the bank's good-faith affirmative defense. We also conclude that the bankruptcy court did not clearly err in determining that the bank satisfied its burden of proving a

---

[6] We find no merit in the trustee's assertion that the bankruptcy court erroneously imposed on the trustee the burden to disprove the bank's affirmative defense. The court properly weighed the entirety of the evidence and rendered its decision accordingly.

26

good-faith defense under Section 548(c).[7]  Accordingly, we affirm the district court's decision upholding the bankruptcy court's dismissal of the trustee's adversary action.

<u>AFFIRMED</u>

---

[7]  Because we conclude that the bankruptcy court did not clearly err in accepting the bank's affirmative defense of good faith, we need not reach the trustee's argument regarding whether the trustee was entitled to a "Ponzi scheme presumption" of fraudulent conveyances.

WYNN, Circuit Judge, dissenting:

Bankruptcy Code Section 548(c) provides an affirmative defense to transferees who take in good faith. Importantly, good faith has not just a subjective, but also an objective "observance of reasonable commercial standards" component. To succeed with its good faith defense, First Tennessee Bank had to prove both aspects of good faith. But here, it failed to proffer any evidence to support a finding that it received transfers from FMI with objective good faith in the face of several alleged red flags. Because it was clear error for the district court to make the unsupported finding that First Tennessee Bank received transfers from FMI with objective good faith, I must respectfully dissent from the contrary view of my colleagues in the majority.

I.

We review a district court finding of good faith for clear error. "A finding is clearly erroneous if no evidence in the record supports it . . . ." Consol. Coal Co. v. Local 1643, United Mine Workers of Am., 48 F.3d 125, 128 (4th Cir. 1995). Thus, we reverse findings of fact that lack evidentiary support—and that is, in my view, what must be done here.

28

II.

Under Bankruptcy Code Section 548(a), a bankruptcy trustee can avoid fraudulent transfers occurring within the two years prior to a bankruptcy petition's filing if those transfers were made with intent to defraud or for less than reasonable consideration. 11 U.S.C. § 548(a). Nevertheless, a recipient of transferred property can keep the property if it is able to establish the elements of the good faith defense embodied in Section 548(c). 11 U.S.C. § 548(c).

In In re Nieves, this Circuit put contours on the good faith defense. 648 F.3d 232 (4th Cir. 2011). As the majority notes, we held that to establish the good faith defense, a transferee needs to show both subjective and objective good faith:

> "Good faith" thus contains both subjective ("honesty in fact") and objective ("observance of reasonable commercial standards") components. Under the subjective prong, a court looks to "the honesty" and "state of mind" of the party acquiring the property. Under the objective prong, a party acts without good faith by failing to abide by routine business practices. We therefore arrive at the conclusion that the objective good-faith standard probes what the transferee knew or should have known, taking into consideration the customary practices of the industry in which the transferee operates.

Id. at 239-40 (citations and footnotes omitted). In essence, transferees may not bury their heads in the sand, "willfully turn[] a blind eye to a suspicious transaction[,]" and then

29

expect to reap the benefits of the good faith defense.  Id. at 242 (quotation marks omitted).  A transferee "wil[l]ful[ly] ignoran[t] in the face of facts which cried out for investigation . . . cannot have taken in good faith."  Id. at 241.

Importantly, it is the transferee who bears the burden of proof on the good faith defense.  As this Court has stated, "we agree with the weight of authority holding that [the good faith defense is] a defense to an avoidance action which defendant bears the burden to prove."  Id. at 237 n.2 (citing In re Smoot, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999) (collecting cases holding that the burden of proof rests on the transferee)).

In sum, to establish the good faith defense, First Tennessee Bank needed to show not only subjective good faith but also objective good faith.  Thus, First Tennessee Bank bore the burden of showing that its conduct comported with routine practices in its industry and that its response to potential "red flags" about FMI's fraud comported with that of an objectively reasonable warehouse lender.  The record before us shows that First Tennessee Bank failed to carry its burden.

III.

Preliminarily, I must address several general points that the majority makes, and with which I take issue, regarding the

nature of the evidence required in cases such as this one and the nature of the evidence actually proffered here.

First, I agree with the majority that First Tennessee Bank could meet its burden as to the objective component of its good faith defense without presenting expert testimony on prevailing industry standards. To be sure, such objective, third-party evidence would almost certainly be helpful in establishing industry standards. And one cannot help but wonder why it was not proffered here.

Regardless, fact witness testimony could suffice. For example, a fact witness could testify that he attended industry conferences and drafted the pertinent bank's policies based on, and in accordance with, best practice materials received at those conferences.[8]

The problem here is that First Tennessee Bank, which bore the burden of proving its good faith defense, failed to elicit such testimony from its fact witnesses. Instead, it relied on

---

[8] That being said, I find the suggestion that expert testimony might somehow bungle "the presentation of a defense that ordinarily is based on the facts and circumstances of each case and on a particular witness' [sic] knowledge of the significance of such evidence[,]" ante at 18-19, troubling. Indeed, that suggestion seems to fly in the face of the very point of the good faith defense's objective component—which is based not on case-specific facts or fact witness views, but rather on what the transferee knew or should have known, "taking into consideration the customary practices of the industry in which the transferee operates." In re Nieves, 648 F.3d at 240.

generalities from those witnesses such as having read the Wall Street Journal and having worked in the industry for many years.

Further, an executive's extensive knowledge of an industry does not necessarily mean that his business comports with industry standards. Indeed, that very knowledge might be used effectively for ill, enabling the executive to conceive of and perpetuate a scheme that turns industry standards on their heads. Industry knowledge and experience thus shed little light on whether an executive or his business acted with objective good faith.

Moreover, it is common knowledge that the economy, including the mortgage-backed securities industry—was in turmoil in 2007 and 2008. But that fact does not illuminate, for example, whether First Tennessee Bank's attributing FMI's problematic conduct to the slowdown was reasonable in light of industry standards. For it is also common knowledge that frauds such as Ponzi schemes are particularly vulnerable to implosion during economic downturns. That FMI's troubles coincided with an economic downturn thus does not resolve objective good faith questions. Objective good faith cannot simply be assumed in tough times; it remains an affirmative defense that must always be proven.

Here, Garrett and Daugherty may have explained "their reasons" why FMI's conduct did not suggest fraud. Ante at 20.

32

But "their" reasons are evidence of "their" subjective good faith—not of objective good faith, taking into consideration industry standards.

Finally, I agree with the majority opinion that Garrett's and Daugherty's employment with First Tennessee Bank did not affect the admissibility of their testimony or render it incompetent. But the record is irreconcilable with the majority opinion's assertion that the Trustee failed to object to Garrett's and Daugherty's "general testimony" regarding the industry or economic conditions in 2007 and 2008. Ante at 20-21. On the contrary, the Trustee repeatedly objected to Garrett's and Daugherty's attempts at "general testimony," on the bases that the testimony was overbroad, that neither witness was tendered as an expert, and that the testimony should be tethered specifically to First Tennessee Bank, for which both men were testifying strictly as fact witnesses. See, e.g., J.A. 1376, 1379, 1383, 1512, 1517. In response to these objections, First Tennessee Bank reiterated that "[i]t's just background information[,]" and that it was "not trying to establish what every [actor] does[,]" and limited lines of inquiry to First Tennessee Bank specifically. See, e.g., J.A. 1376, 1384, 1512, 1517. The majority opinion's suggestion that challenges to any broad, industry-level testimony were waived is thus misplaced.

33

More importantly, objections aside, looking to the testimony that First Tennessee Bank proffered on objective good faith, I must conclude that the scant evidence fails to support the bankruptcy court's objective good faith finding. Specifically, the Trustee identified multiple red flags, asserting that First Tennessee Bank's response to those red flags failed to comport with that of a reasonable warehouse lender. The Trustee argues that First Tennessee Bank failed to carry its burden of proof and that the bankruptcy court erred in finding that "the bank's actions were in accord with . . . the industry's usual practices." In re Taneja, 08-13293-RGM, 2012 WL 3073175, at *15 (Bankr. E.D. Va. July 30, 2012). After carefully reviewing the record, I cannot even discern what those industry practices are, let alone find evidence that First Tennessee Bank's actions comported with them.

Turning to some of these red flags, the Trustee asserted, for example, that at a meeting between First Tennessee Bank and FMI's counsel, Mr. Garrett specifically asked whether FMI's loans were fraudulent. Mr. Garrett then testified that in response, FMI's counsel indicated that the loans were valid, and that First Tennessee Bank relied on the statement and followed up by "look[ing] at property, pull[ing] appraisals, [and] saw FMI listed as the mortgagor on some of them." J.A. 1489. What is missing from the record is any shred of evidence that First

34

Tennessee Bank's reliance and investigation comported with those of a reasonable warehouse lender in light of industry standards. In other words, the bankruptcy court had no support for a finding that despite First Tennessee Bank's own concerns that FMI's loans might be fraudulent, it received all the relevant transfers in not only subjective, but also objective, good faith.

A second example: The Trustee highlighted that FMI belatedly delivered collateral documents it was required to transmit. As the majority opinion notes, "Garrett testified that a new borrower's untimely delivery of such documents was 'common' and was 'consistent' with the practices of other investors and warehouse lending customers at the inception of their business relationship." Ante at 21. But that experience was "common" and "consistent" only with First Tennessee Bank's customers and "what we're dealing with . . . ." J.A. 1491. The testimony centered on "all of your"—i.e., First Tennessee Bank's—"customers," J.A. 1506, and was "[b]ased on your experience . . . ." Id.; see also, e.g., J.A. 1543 (Q: "Mr. Daugherty, do most of your customers get you the full collateral package within two days?" A: "No." (emphasis added)). Missing from the record is objective evidence regarding standard industry practices and how FMI's delays and First Tennessee Bank's response to those compared to those industry practices.

35

A third example: The Trustee asserted that FMI's attributing its failure to sell loans to an employee's having gone on vacation and then not returning constituted a red flag. Mr. Daugherty testified that he believed this excuse and had no reason to suspect that it was not the truth. Even the bankruptcy court called the explanation "unusual." In re Taneja, 2012 WL 3073175, at *13. Yet First Tennessee Bank offered no evidence about how a reasonable warehouse lender would have responded or whether its response comported with that industry standard.

For various red flags the Trustee raised, the majority opinion ascribes much to the fact that the lending and mortgage industries were in turmoil in 2007 and 2008. Surely no one doubts that the entire economy was in a state of upheaval during that time. But that fact tells us little about whether a business's conduct in the face of alleged red flags, even if in a time of crisis, comported with industry practices and standards. If economic turmoil gives businesses a free pass on needing to prove objective good faith, even businesses falling far short of industry standards but rather "wil[l]ful[ly] ignoran[t] in the face of facts which cried out for investigation[,]" In re Nieves, 648 F.3d at 241, could succeed with a good faith defense so long as their implosion coincided

36

with an economic downtown.  This is not, and should not be, the law.

IV.

In sum, I agree with the majority that "'[d]eference to the bankruptcy court's findings is particularly appropriate when . . . the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility determinations.'" <u>Ante</u> at 25-26 (quoting <u>Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors</u>, 453 F.3d 225, 235 (4th Cir. 2006)).  But the issue here is not that, or how, the bankruptcy court assessed credibility or weighed testimony.  Instead, the issue is whether First Tennessee Bank, which bore the burden of proof, failed to proffer any evidence or elicit any testimony to support a finding that it received transfers from FMI with objective good faith in the face of certain alleged red flags.  It did.  And because findings unsupported by the record must be overturned on clear error review, I would reverse the unsupported objective good faith finding, a necessary component of First Tennessee Bank's good faith defense under 11 U.S.C. § 548(c).  Accordingly, I respectfully dissent.